959 P.2d 1274

**STATE of Arizona, Appellee,**

v.

**Richard Kenneth DJERF, Appellant.**

**No. CR–96–0296–AP.**

Supreme Court of Arizona,
En Banc.

May 21, 1998.

Grant Woods, Attorney General, by Paul J. McMurdie, Chief Counsel Criminal Appeals Division, Phoenix, for Appellee.

Lisa Marie Martin, Phoenix, for Appellant.

## OPINION

JONES, Vice Chief Justice.

¶ 1 The defendant, Richard Kenneth Djerf, accepted a plea agreement which resulted in convictions of four counts of first degree murder. He was sentenced to death on each count. This is a mandatory appeal of the death sentences pursuant to Rules 26.15 and 31.2 of the Arizona Rules of Criminal Procedure. The court has jurisdiction under article VI, section 5(3), of the Arizona Constitution and A.R.S. section 13–4301. We affirm the convictions and sentences.

## FACTS

¶ 2 The defendant and Albert Luna, Jr. met and became friends while working as night custodians at a Safeway supermarket. In January 1993, Luna entered defendant's apartment without defendant's permission and took several items, including a television, a VCR unit, stereo equipment, a car alarm, and an AK–47 assault rifle. Although defen-dant told Glendale police he suspected Luna had committed the crime, the police took no action. The matter festered for several months until the defendant, still angered by the burglary and frustrated by police inaction, determined to take revenge.

¶ 3 In the late morning hours of September 14, 1993, defendant went to the Luna family home, taking his nine-millimeter Beretta handgun, a knife, latex gloves, handcuffs, red fuse cord, and artificial flowers in a vase to use as a ruse to gain entry. When Luna's mother, Patricia, answered the door to receive the flowers, defendant pushed his way into the house, showing her his gun. Defendant took Patricia into the master bedroom and bound her, letting her five-year-old son, Damien, run free. Later, while holding Damien hostage, defendant freed Patricia and forced her to place items of property into the Luna family car, including two VCR units, a telephone, a caller ID box, a stereo CD player, four watches, change, and a money clip with food stamps. He then took Patricia and Damien into the kitchen and bound them to chairs with rope and black electrical tape. More than once, he asked Patricia whether she or her son should die first. He also asked her if she knew the whereabouts of her son, Albert Jr.

¶ 4 Around 3:00 p.m., Rochelle, Patricia's daughter, age eighteen, came home. Defendant took Rochelle to her bedroom, gagged her with tissue paper and tape, tied her wrists to the bed, cut and removed her clothes with a knife, and raped her. Defendant then stabbed Rochelle four times in the chest and slit her throat, severing the jugular vein. Two of the chest wounds and the throat wound were potentially fatal. Rochelle further suffered multiple shallow knife wounds to the back of her head while she was alive, and one, probably postmortem, superficial stab wound to her right temple. Her earring had been torn through the earlobe. At some point while still alive, Rochelle vomited behind the gag and aspirated the vomit. Defendant then told Patricia he had raped and killed her daughter.

¶ 5 Around 4:00 p.m., Albert Luna, Sr. arrived home from work. Defendant handcuffed him, forced him to crawl to the master

bedroom, and placed him face down on the bed. He struck Albert in the back of the head multiple times with an aluminum baseball bat, inflicting three large lacerations and spattering blood throughout the room. The medical examiner testified that hemorrhaging from these wounds was potentially fatal. Defendant removed the handcuffs from Albert, taped his hands and wrists together, and left him for dead. He then walked to the kitchen and told Patricia that he had killed her husband.

¶ 6 Defendant next attempted to snap Damien's neck by twisting the head abruptly from behind, "like he had seen in the movies." In fact, he "turned [Damien's head] all the way around and nothing happened," so he freed the child's head. In an attempt to electrocute Damien, defendant cut an electrical cord from a lamp in the kitchen, stripped the insulation from the wires, and taped it to the skin on Damien's calf. The cord was found unplugged at the scene.

¶ 7 Albert, although badly injured, freed himself from the tape around his wrists, went to the kitchen, and charged defendant with a pocketknife, wounding him seriously. During the ensuing struggle, defendant stabbed Albert with enough force to drive a knife through the right arm and into the torso. Defendant managed to pull the Beretta from his belt and shot Albert six times. Albert fell at the feet of his wife and son.

¶ 8 Defendant asked Patricia, "Do you want to watch your kid die, or do you want your kid to watch you die?" Defendant then shot both Patricia and Damien in the head at close range.

¶ 9 Defendant splashed gasoline on the bodies and throughout the house. His girlfriend, Emily Boswell, testified that defendant told her he lit the red fuse cord but put it out when he realized there were children playing outside and he could not leave the house immediately without being seen. A short while later, he turned on two of the kitchen stove burners, placed an empty pizza box and a rag on the stove, and left the house. Defendant then drove to his apartment in the Lunas' family car, the stolen property inside, where he encountered Boswell at about 6:00 p.m. He told Boswell that

he had been stabbed by two men who tried to rob him. He later went to the hospital and was admitted.

¶ 10 For some reason, the pizza box and rag failed to ignite the gasoline. Albert Jr. had not gone to his home the night of September 13, and did not return until 11:45 p.m. the day of the murders, September 14. Numerous unanswered calls to the house had made him anxious. When Luna entered the home and discovered the bodies of his parents and brother, he immediately left and drove to his girlfriend's house where he called the police.

¶ 11 The next day, September 15, defendant disclosed to Boswell that he had murdered four members of the Luna family and described to her how he had done it. Defendant told Boswell that the blood dripping from Patricia's gunshot wound was "really awesome" and "you should have been there." On September 16, a friend, Travis Webb, checked defendant out of the hospital, but defendant was unwilling to go to his own apartment. Webb rented a motel room, where defendant stayed until September 18. Also on September 16, defendant called another friend, Daniel Greenwood, in California, and once again, revealed his role in the four murders. While in the motel room, defendant also told Webb of his involvement in the murders at the Luna home.

¶ 12 On September 18, Phoenix police executed search warrants on the motel room and defendant's car and apartment. The police found handcuffs, a nine-millimeter Beretta, a stereo CD player, two VCR units, a U.S. West caller ID unit, artificial flowers and a vase, watches, Rochelle's charm necklace, a cardboard knife sheath, Patricia's car keys, a telephone, loose change, food stamps, and a red fuse cord. Police arrested defendant the same day. At the time of arrest, the police found a handcuff key and a newspaper section containing an article about the killings in his possession.

## PROCEDURAL HISTORY

¶ 13 A Maricopa County Grand Jury indicted defendant for the following crimes: Count One, first degree murder of Albert B.

Luna, Sr.; Count Two, first degree murder of Damien Luna; Count Three, first degree murder of Patricia Luna; Count Four, first degree murder of Rochelle Luna; Count Five, first degree burglary; Counts Six through Nine, kidnapping; Count Ten, sexual assault; Counts Eleven through Fifteen, aggravated assault; Count Sixteen, attempted arson of an occupied structure; Count Seventeen, theft; and Count Eighteen, misconduct involving weapons.

¶ 14   Michael Vaughn and Alan Simpson were appointed as trial counsel, but on February 15, 1995, defendant filed a motion to remove both and to substitute himself as counsel *pro se* for all future proceedings in the trial court.

¶ 15   The court held a hearing on defendant's requests on February 23 and found, based on the record, that defendant's waiver of counsel was made voluntarily, knowingly, and intelligently.   The trial court granted defendant's motion for *pro se* representation, and Vaughn and Simpson were appointed as advisory counsel.

¶ 16   On March 17, three weeks later, the state filed a motion for a Rule 11 evaluation to determine defendant's competence to waive counsel and conduct his own defense in view of an apparent suicide attempt soon after his arrest.   Defendant filed a motion agreeing to such an evaluation, to "remove any doubt as to . . . competence."   The trial court ordered preparation of a prescreening evaluation to determine whether a Rule 11 examination was warranted.   Dr. Jack Potts evaluated defendant and pronounced him competent.   Based largely on Dr. Potts' findings, the trial court concluded that no reasonable grounds existed to grant a complete Rule 11 competency hearing and reaffirmed its finding that defendant should be allowed to proceed *pro se.*

¶ 17   Defendant then entered into the plea agreement with the state.   By its terms, defendant pled guilty to four counts of first degree murder in the deaths of Albert Sr., Damien, Patricia, and Rochelle Luna. The agreement expressly stated that no limits would be placed on sentencing and defendant could be sentenced to death for any or all of the murder counts.   In return, the state agreed to dismiss the remaining counts.

¶ 18   On August 16, 1995, the trial court held a hearing on the plea agreement.   After informing defendant of specified constitutional rights which would be relinquished by accepting the plea agreement, acknowledging Dr. Potts' prescreening report, and reaffirming the finding of competency, the trial court found that the guilty pleas had been made knowingly, intelligently, and voluntarily.

¶ 19   Approximately seven weeks later, defendant withdrew his waiver of counsel and accepted representation.   Several days of presentence hearings ensued, following which the trial court rendered its special verdict. The trial court found that the state had proven beyond a reasonable doubt that the murders were committed for pecuniary gain (A.R.S. section 13–703(F)(5)), in an especially heinous, cruel, or depraved manner (A.R.S. section 13–703(F)(6)), and during the commission of one or more other homicides (A.R.S. section 13–703(F)(8)), and that at the time of the offense, defendant was an adult and one of the victims, Damien Luna, was under fifteen years of age (A.R.S. section 13–703(F)(9)).   The trial court also found that defendant had failed to prove either the statutory mitigating factors or the non-statutory mitigating factors—post-arrest conduct, disadvantaged childhood, psychological disorder, remorse, adjustment to confinement, and acceptance of responsibility.   Accordingly, the court imposed the death sentence on defendant on each of the four counts.

## ISSUES

### I.   Waiver of Counsel

¶ 20   Defendant first argues that the trial court abused its discretion in finding that no Rule 11 hearing should be conducted and that defendant's waiver of counsel was knowing and intelligent.   He argues that a lack of communication with counsel and defendant's depressive behavior precluded a knowing and intelligent waiver.

¶ 21   The federal and state constitutions guarantee the right to waive counsel and to represent oneself.   U.S. Const. amend. VI; U.S. Const. amend. XIV; Ariz.

Const. art. II, section 24. Self-representation is a "fundamental constitutional right." *Montgomery v. Sheldon,* 181 Ariz. 256, 259, 889 P.2d 614, 617 (1995) (citing *Faretta v. California,* 422 U.S. 806, 836, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975)). One important restriction on that right is that the waiver of counsel must be made voluntarily, knowingly, and intelligently. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981); *State v. Cornell,* 179 Ariz. 314, 322, 878 P.2d 1352, 1360 (1994). In *Edwards,* the U.S. Supreme Court stated that a waiver of counsel "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1884. The trial court may also consider evidence as to defendant's knowledge and understanding when he waived counsel. State v. Martin, 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967). However, a mentally incompetent defendant is incapable of voluntarily, knowingly, and intelligently waiving the right to counsel. Cornell, 179 Ariz. at 321, 878 P.2d at 1360.

■ ¶ 22 Rule 11 of the Arizona Rules of Criminal Procedure allows any party to move for a competency hearing. Ariz. R.Crim. P. 11.2. A competency hearing may be had for the purpose of determining whether the defendant is mentally able to stand trial, as well as to determine whether the defendant is competent to conduct his own defense. *Martin,* 102 Ariz. at 145–46, 426 P.2d at 642–43; *see also State v. Westbrook,* 101 Ariz. 206, 417 P.2d 530 (1966). After the motion is made, if the court finds that "reasonable grounds" exist for a mental examination, it will appoint two medical experts to examine the defendant and to testify concerning those findings at a subsequent hearing. Ariz. R.Crim. P. 11.3; *State v. Johnson,* 147 Ariz. 395, 398, 710 P.2d 1050, 1053 (1985)

(using "reasonable grounds" test to decide whether hearing may help determine defendant's competence to stand trial); *State v. Herrera,* 176 Ariz. 21, 31, 859 P.2d 131, 141 (1993) (same); *Martin,* 102 Ariz. at 146, 426 P.2d at 643 (using "reasonable grounds" test to decide whether hearing may help determine defendant's competence to waive counsel). Evidence that creates a reasonable doubt in the court's mind as to a defendant's competency is sufficient to establish reasonable grounds. *State v. Williams,* 166 Ariz. 132, 139, 800 P.2d 1240, 1247 (1987); *State v. Borbon,* 146 Ariz. 392, 395, 706 P.2d 718, 721 (1985).

■ ¶ 23 At the initial hearing on February 23, held on the waiver of counsel motion, the trial court fully informed defendant of his right to counsel, the minimum, maximum, and presumptive sentences, the dangers of self-representation, and the difficulties involved in defending oneself without formal legal training. Defendant's attorneys informed the court they did not think it was in defendant's best interest that he defend himself, but both indicated to the court they believed he was competent to do so. When asked, defendant told the trial court his reason for requesting the waiver was that he felt there was insufficient communication between himself and his attorneys. The trial court explained to defendant that his attorneys had been fully engaged, working on his behalf.

■ ¶ 24 Defendant argues that the trial court should not have found his waiver knowing and intelligent [1] when the stated reason for the waiver was a lack of communication with appointed counsel. Defendant cites no authority for this proposition. This court has held that dissatisfaction with counsel does not, of itself, warrant a competency hearing. *Johnson,* 147 Ariz. at 399, 710 P.2d at 1054. Indeed, "[i]f every personal conflict between a criminal defendant and his appointed counsel gave rise to reasonable grounds for a competency hearing, then almost every de-

---

1. Although the argument heading in defendant's brief states that defendant's waiver of counsel was not knowing or voluntary, the entire textual analysis goes to the knowing and intelligent factor. The U.S. Supreme Court, in *Edwards v.*

*Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1980), held that voluntariness and intelligence/knowledge are two separate inquiries. The record, as described, is uncontrovertible. Defendant's waiver was clearly voluntary.

fendant would receive one." *Id.* Absent some indication that a defendant was irrational or delusional, dissatisfaction with one's counsel is immaterial. *Id.*; *see also Harding v. Lewis,* 641 F.Supp. 979, 989 (D.Ariz.1986) ("The question of why a defendant chooses to represent himself is immaterial."). Defendant's dissatisfaction with counsel, standing alone, is of no moment in deciding whether the waiver was voluntary, knowing, and intelligent.

¶ 25 Given the care taken by the trial judge to inform defendant of the ramifications of his decision, defendant's appropriate and rational responses, and the attorneys' assurances of competency, one may only conclude that defendant fully understood the consequences of his waiver. Martin, 102 Ariz. at 145–46, 426 P.2d at 642–43. The court's finding that the waiver was made knowingly and intelligently was not error.[2]

■ ¶ 26 Moreover, the findings in Dr. Potts' prescreening report do not, as defendant argues, cast doubt on the trial court's determination of competency. After the initial hearing on waiver, the state moved for the Rule 11 hearing. In order to aid in its determination whether reasonable grounds existed for such hearing, the court solicited a preliminary psychiatric report from Dr. Potts. The report stated that defendant was competent to stand trial, to proceed *in propria persona,* and to enter a plea agreement. The report also stated that the trial court and attorneys "will have to be aware of Defendant's past proclivity towards depressive reactions and monitor whether or not they feel he is effectively continuing with his Pro Per status." Defendant argues that the trial court abused its discretion in denying the

Rule 11 hearing in light of this statement[3] and defendant's actual depressive behavior.

¶ 27 The report further concludes that defendant had a rational and factual understanding of the charges and of the legal proceedings facing him, that Dr. Potts found no evidence that defendant was suicidal, that he had no problems with his appetite or sleep patterns, and that he had last been treated by a psychiatrist some seven months before. Finally, the state correctly argued that Dr. Potts' conclusion that the court and the attorneys should continue to monitor defendant's ability to represent himself is no more than the duty mandated by *State v. Mott,* 162 Ariz. 452, 459–60, 784 P.2d 278, 285–86 (App. 1990) (after waiver, court must continue to monitor defendant's behavior and order hearings on issue of competency "if it becomes aware of any evidence of defendant's incompetency to represent himself that would jeopardize his right to a fair trial").

¶ 28 Dr. Potts expressly determined that there was no reason further to question defendant's competency. Defendant's counsel at no time indicated to the court that defendant showed signs of incompetence. Accordingly, we conclude without difficulty that the evidence established defendant's competency and that there were no reasonable grounds on which to justify a Rule 11 hearing. Williams, 166 Ariz. at 139, 800 P.2d at 1247; Ariz. R.Crim. P. 11.3.

## II. "Change of Counsel" Issue

■ ¶ 29 In a supplemental brief, defendant argues that the trial court abused its discretion by granting defendant's request to remove trial counsel and to substitute himself as counsel *pro se.* He asserts that the trial judge erred by failing to inquire into the

---

2. Defendant argues that the trial court abused its discretion in allowing the waiver of counsel. However, as stated in *State v. Cornell,* 179 Ariz. 314, 321, 878 P.2d 1352, 1359 (1994), the applicable standard of review governing the issue of a defendant's waiver of counsel has not yet been settled by this court. The parties have not argued the standard of review to us, and we decline to address it here. However, we note that our holding on this issue would be the same under either a de novo or a deferential standard.

3. Defendant states in his brief that the trial court abused its discretion in that "there was no mechanism put in place for [defendant's depressive] tendencies to be monitored as the prescreening directed in order to continue to properly assess defendant's continued ability to represent himself." Any suggestion that the prescreening report directed that a "mechanism" separate from the observations of the court and attorneys themselves be put in place to monitor defendant amounts to a misstatement of the facts. The report directed that the monitoring be done by the court and the attorneys.

reasons defendant wanted his own substitution as counsel and alleges that the court's actions fail the test of *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir.1997) (when deciding motion for change of counsel, reviewing court looks at adequacy of trial court's inquiry, extent of conflict between defendant and counsel, and timeliness of motion). *See also United States v. D'Amore*, 56 F.3d 1202, 1204–05 (9th Cir.1995). In support, defendant refers to a letter he wrote to the judge dated February 14, 1995, describing dissatisfaction with what he perceived as a lack of communication between himself and trial counsel. Because the letter preceded his February 15 motion to "substitute himself" as counsel, defendant argues, the trial judge should have known that defendant "was really seeking the representation of counsel who would communicate with him."

¶ 30 Although not expressly stated in his supplemental brief, defendant apparently wishes now to treat the motion at issue as one to change counsel, rather than to waive counsel and substitute self. The impetus for his characterization seems to be (1) the aforementioned letter and (2) the title of the form upon which he asked to represent himself. The motion was titled "CHANGE OF COUNSEL" and stated:

> I, RICHARD K. DJERF, hereby request that MICHEAL [sic] VAUGHN/ALAN SIMPSON be withdrawn as my counsel of record, and that RICHARD K. DJERF be substituted as my attorney in all future proceedings in the trial court.

¶ 31 Defendant's later characterization of the motion as one to obtain new counsel is contradicted by the record. In his letter of February 14, defendant enumerated his complaints about counsel, but never once suggested that he wanted new counsel appointed. At a hearing on February 17, the trial judge (who had not yet received the letter but did have the motion) stated that what he had before him was "basically" a motion for self-representation by defendant and asked defendant if he still desired to represent himself. Defendant replied in the affirmative, and the trial judge scheduled the February 23 hearing. (The trial court did not receive defendant's letter until February 21.) At the February 23 hearing, the court treated the motion as stated on its face, to proceed *pro se*, and neither defendant nor his attorneys objected to this or gave any sign that this was not consistent with defendant's intent. Defendant never characterized his request as one for new counsel, not in his letter nor at the hearing nor at any time prior to his supplemental brief in this court. He requested only that he be allowed to represent himself. Further, in a later motion, defendant himself characterized his February 15 motion as a request to proceed *pro se*.[4]

¶ 32 Because defendant had an absolute constitutional right to act *pro se*, the trial court correctly determined that defendant was competent and that the waiver of counsel was made voluntarily, knowingly, and intelligently. Defendant's argument is meritless, and *Gonzalez*, which describes the test for whether a trial court has abused its discretion in denying a motion to change counsel, is inapplicable.

¶ 33 Finally, the September 1995 motion which the trial judge denied was mentioned in defendant's brief only to bolster the argument that his February 15 motion was intended to request different counsel, not to challenge the denial.[5]

---

4. "Because the defendant was constantly being put aside by his court appointed attorneys, the *defendant decided to represent himself.* On February 15 the defendant, requesting to represent himself, filed his motion. The defendant figured that the only way to eliminate these problems was to defend himself." Defendant's Motion for Change of Counsel, Sept. 6, 1995.

5. The trial court's denial of the September motion does not constitute an abuse of discretion under Arizona law. This court, in *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), points out that although irreconcilable conflict is not permitted, conflict between counsel and a criminal *defendant is* but one factor a court may consider in deciding whether to substitute counsel. *Id.* at 591, 858 P.2d at 1194 (citing *State v. LaGrand*, 152 Ariz. 483, 486–87, 733 P.2d 1066, 1069–70 (1987)). Other factors include: the timing of the motion, inconvenience to witnesses, the time period already elapsed between the alleged offense and trial, the proclivity of the defendant to change counsel, and quality of counsel. *LaGrand*, 152 Ariz. at 486–87, 733 P.2d at 1069–70. The trial court concluded reasonably that further

## III. Guilty Pleas

¶ 34 Defendant argues that by failing to inform him of the trial-like nature of the presentencing hearing, the trial court abused its discretion in finding that defendant's guilty pleas were informed and intelligent.

¶ 35 A plea of guilty, when accepted, involves the waiver of constitutionally protected rights. Accordingly, waiver "must be 'an intentional relinquishment or abandonment of a known right or privilege.'" *Boykin v. Alabama,* 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 1712 n. 5, 23 L.Ed.2d 274 (1969) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). A plea of guilty, like a waiver of counsel, must be entered voluntarily, intelligently, and knowingly. *Id.* at 242, 89 S.Ct. at 1712. Because the death sentence may result from a guilty plea, the court must take special care "to make sure [a defendant] has a full understanding of what the plea connotes and of its consequence." *Id.* at 243–44, 89 S.Ct. at 1712. The standard of review is whether the trial court abused its discretion in finding that the defendant waived his rights and entered into a plea agreement. *State v. Brewer,* 170 Ariz. 486, 495, 826 P.2d 783, 792 (1992). The court must determine if "reasonable evidence" supports the finding that the defendant was competent to enter the plea. *Id.* (citing *State v. Bishop,* 162 Ariz. 103, 104, 781 P.2d 581, 582 (1989)). Under this standard, the court considers the facts in a light most favorable to sustaining the trial court's finding. *Bishop,* 162 Ariz. at 104, 781 P.2d at 582.

¶ 36 Both state and federal law require that the trial court, before accepting a guilty plea, determine that the defendant understands (1) the nature of the charges, (2) the nature and range of possible sentences, including any special conditions, (3) the constitutional rights waived by pleading guilty, (4) the right to plead not guilty, and (5) that the right to appeal is also waived if the defendant is not sentenced to death. Ariz. R.Crim. P. 17.2; *Boykin,* 395 U.S. at 243, 89 S.Ct. 1709; *State v. Barnes,* 167 Ariz. 186, 189, 805 P.2d 1007, 1010 (1991).

¶ 37 This record shows that the trial judge fully satisfied each requirement and informed defendant before the guilty pleas were accepted that a presentence hearing would be held to determine sentencing. Defendant does not dispute the record. Rather, he asserts that the trial court erred in failing to inform him that the presentence hearing would be trial-like in that evidence and testimony would be given and witnesses would be examined and cross-examined. Defendant argues that had he understood the character of the hearing, he would not have pled guilty and would instead have gone to trial. His guilty pleas were thus neither informed nor intelligent.

¶ 38 Defendant cites no authority for this argument. Moreover, the record reveals that at no time before the pleas were accepted did defendant inform the trial court that he entered the plea agreement in order to avoid a proceeding resembling a trial. The statement in the record upon which he relies [6] was made to a news reporter, who repeated it in testimony to the trial court during the presentence hearing, long after the plea had been accepted. The trial court correctly determined that defendant knowingly, intelligently, and voluntarily waived his rights. Acceptance of the pleas was not an abuse of discretion.[7]

delay and inconvenience caused by bringing new counsel current in a death penalty case on the eve of the presentencing hearing was insupportable, and, in any event, that trial/advisory counsel was of high quality. Moreover, although defendant stated that he had lost confidence in Mr. Vaughn and Mr. Simpson, a mere allegation of lost confidence does not require appointment of substitute counsel. *State v. Crane,* 166 Ariz. 3, 11, 799 P.2d 1380, 1388 (App.1990).

6. Defendant told the reporter he pled guilty because "if he had a jury hearing all of the things

that had happened at the Luna house, that it would inflame them, and it would be harder on him than if he just went before a judge." Special Verdict at 18.

7. Defendant made no motion nor did he indicate at any time a desire to withdraw the pleas. A trial court may allow the withdrawal of a guilty plea "when necessary to correct manifest injustice." Ariz. R.Crim. P. 17.5. Even assuming that defendant's lack of understanding of a presentence hearing could be considered "manifest injustice," a trial court cannot, *sua sponte,* vacate

## IV. Mitigation/Aggravation

¶ 39 Pursuant to A.R.S. section 13–703, this court, in assessing the propriety of death sentences, reviews *de novo* the findings of the trial court regarding aggravating and mitigating circumstances. A.R.S. section 13–703.01; *State v. Jones,* 185 Ariz. 471, 492, 917 P.2d 200, 221 (1996); *State v. Roscoe,* 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The state must prove the existence of statutory aggravating factors beyond a reasonable doubt. *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. Defendant need only prove mitigating circumstances by a preponderance of the evidence. *Id.* at 504, 826 P.2d at 801. On appeal, this court must determine whether defendant's evidence of mitigating factors, assessed separately or cumulatively, is sufficient to outweigh evidence of the aggravating factors introduced by the state. *Id.*

### A. Evidentiary Standard at Presentence Hearing

¶ 40 Defendant argues that the trial court applied the wrong standard to the evidence of aggravation and thus allowed introduction of irrelevant and prejudicial information. He reasons that the court must have improperly considered irrelevant and prejudicial evidence because the judge stated immediately before sentencing that he had considered *"all"* the testimony and evidence presented, and the judge failed to find mitigation.

¶ 41 We presume the trial court disregards all inadmissible evidence in reaching a decision. *State v. Gonzales,* 111 Ariz. 38, 41, 523 P.2d 66, 69 (1974) (citing *State v. Garcia,* 97 Ariz. 102, 397 P.2d 214 (1964)); *see also State v. Cameron,* 146 Ariz. 210, 215, 704 P.2d 1355, 1360 (App.1985). The plain statement that a trial court considers *all* the evidence does not suggest an improper decision. Nothing in this record indicates that the judge accorded weight to irrelevant or prejudicial evidence. Indeed, the record is devoid of such matters.

¶ 42 We hold that the trial judge's statement that he considered *all* evidence and found no mitigating factors will not rebut the presumption that inadmissible evidence was disregarded. In practical terms, the argument is wholly non-meritorious.

### B. A.R.S. Section 13–703(F)(6): Especially Heinous, Cruel or Depraved Manner

¶ 43 The trial judge found that each of the four murders was especially cruel and that each was committed in a heinous or depraved manner.

¶ 44 Conduct that is especially cruel, heinous or depraved in the commission of murder will invoke the (F)(6) statutory aggravating factor. Because this subsection is stated in the disjunctive, a finding of either cruelty or heinousness/depravity will suffice to establish this factor. *Roscoe,* 184 Ariz. at 500, 910 P.2d at 651. Defendant argues that the state failed to prove especial cruelty beyond a reasonable doubt in the murders of Albert, Rochelle, and Damien, and failed to prove heinousness/depravity in all four murders.

#### 1. Cruelty

¶ 45 A murder is especially cruel if the victim consciously suffers physical or mental anguish. *Id.* at 500, 910 P.2d at 651; *State v. Bible,* 175 Ariz. 549, 605, 858 P.2d 1152, 1208 (1993). The physical or mental pain suffered must be reasonably foreseeable. *State v. Adamson,* 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983). Mental anguish includes uncertainty as to one's ultimate fate. *State v. Lavers,* 168 Ariz. 376, 392, 814 P.2d 333, 349 (1991). It may also include knowledge that a loved one has been killed. *State v. Gretzler,* 135 Ariz. 42, 53, 659 P.2d 1, 12 (1983). However, where shots, stabbings, or blows are inflicted in rapid succession, quickly leading to unconsciousness, a finding of cruelty based on physical pain is unwarranted without additional supporting evidence that the victim suffered before becoming un-

the acceptance of a guilty plea. *State v. De Nistor,* 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985); *State v. Cooper,* 166 Ariz. 126, 131, 800 P.2d 992, 997 (App.1990). To do so would vio-

late the double jeopardy clause. *De Nistor,* 143 Ariz. at 412, 694 P.2d at 242. Because defendant never moved to withdraw the plea, the trial court committed no error.

conscious. *State v. Soto–Fong,* 187 Ariz. 186, 203–04, 928 P.2d 610, 627–28 (1996).

#### a. Albert Luna, Sr.

¶ 46 Defendant argues that Albert's murder was not cruel because "medical evidence revealed ... no classic defense injuries and the sequence of his wounds could not be determined." The evidence demonstrated, however, that Albert was conscious during part or all of the initial beating with the baseball bat. Even if unconscious, he later regained awareness and strength and, suffering great pain from the wounds, struggled with defendant in the kitchen. Defendant stabbed Albert so fiercely that the knife blade pierced his right forearm and penetrated the torso, where it was later found embedded. Even if subsequent gunshots fired in quick succession into Albert's body were not especially cruel, ample evidence indicates that this victim suffered intense physical pain and anguish before his death. The trial court did not err in finding that Albert's murder was especially cruel.

#### b. Damien Luna

¶ 47 Defendant contends that the murder of Damien Luna was not cruel because no evidence proved Damien had experienced electric shock, nor was there evidence of trauma to Damien's back or upper extremities. Defendant did attempt physically, though unsuccessfully, to break Damien's neck and to electrocute the five-year-old boy. In addition, Damien was present when defendant told Patricia he had killed Rochelle, and the boy saw defendant murder his father. The entire incident lasted several hours, during which Damien unquestionably became uncertain as to his own fate. The trial court did not err in finding Damien's murder to be especially cruel.

#### c. Rochelle Luna

¶ 48 Defendant argues that Rochelle's murder was not cruel because no evidence establishes her conscious state when the stab wounds were inflicted and because the vomit found behind the gag and in the lungs may have been caused by heat or the fact that she had just eaten a large meal.

¶ 49 The medical examiner gave no opinion whether Rochelle was conscious when the stab wounds were inflicted. This court has found, however, that evidence that a victim was bound signifies consciousness. There is no reason to bind an unconscious person who offers no resistance. *Bible,* 175 Ariz. at 605, 858 P.2d at 1208.

¶ 50 Rochelle suffered uncertainty and anguish as to her fate from the time she was forced into the bedroom, gagged with tape and tissue, and bound to the bed. This court has found that uncertainty as to one's fate lasting for a much shorter period warrants a finding of cruelty. *Herrera,* 176 Ariz. at 34, 859 P.2d at 144 (finding eighteen seconds of uncertainty enough to establish mental anguish/cruelty).

¶ 51 Moreover, the medical examiner revealed contusions and abrasions on Rochelle's wrists, indicating a struggle against the restraints. She was thus conscious for some period after being bound, and the evidence is clear that even if Rochelle fell unconscious before having her clothing stripped from her body and an earring torn from her ear, vomiting behind the gag and aspirating the vomit, being raped and having her throat slit and nine stab wounds inflicted upon her, she suffered unspeakable anguish during the attack on her person. Uncertainty as to her fate is clear on this record. We conclude the state proved beyond a reasonable doubt that Rochelle's murder was especially cruel.

#### d. Patricia Luna

¶ 52 Defendant does not dispute the especial cruelty of Patricia's murder. She feared for her life and was uncertain as to her fate for hours. She was forced to watch defendant stab and shoot her husband to death and to hear defendant tell her he had murdered her daughter. Clearly, Patricia Luna's murder was especially cruel.

### 2. Heinous or Depraved

¶ 53 While cruelty involves the victim's physical and mental pain, the heinous or depraved factor involves the killer's

"vile state of mind at the time of the murder." *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. Heinous or depraved conduct may be found through the following five factors: (1) relishing the murder, (2) inflicting gratuitous violence, (3) victim mutilation, (4) senselessness of the crime, and (5) helplessness of the victim. *Id.* at 52, 659 P.2d at 11; *Roscoe*, 184 Ariz. at 500, 910 P.2d at 651. However, senselessness and helplessness alone usually will not suffice to establish heinousness or depravity. *Roscoe*, 184 Ariz. at 500, 910 P.2d at 635. Additionally, murder to eliminate a witness may also support a finding of heinousness or depravity. *State v. Ross*, 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994).

¶ 54 The trial court found that all four murders were heinous or depraved. Defendant challenges those findings with respect to all four. However, as noted, because A.R.S. section 13–703(F)(6) is stated in the disjunctive, a finding of either especial cruelty *or* heinousness/depravity will suffice to establish this aggravating factor. *Roscoe*, 184 Ariz. at 500, 910 P.2d at 651. Because especial cruelty was clearly proved beyond a reasonable doubt in all four murders, we uphold the (F)(6) aggravating factor on the basis of cruelty alone and do not reach the question of heinousness and depravity.

## C. A.R.S. Section 13–703(F)(5): Pecuniary Gain

¶ 55 Where a defendant commits murder in anticipation of pecuniary gain, the (F)(5) factor is invoked. A.R.S. § 13–703(F)(5). To establish murder for pecuniary gain, evidence must show that financial gain was a motive. *Soto–Fong*, 187 Ariz. at 208, 928 P.2d at 632. Defendant argues that, although he removed and retained items from the Luna home, his motive was not pecuniary gain, but revenge on Luna.

¶ 56 The argument lacks merit because, after gaining entry to the Luna home, defendant immediately forced Patricia to place items of personal property into the family car. Then, after fleeing the scene in the car, defendant removed and kept those items before leaving the car in the parking lot. The trial court correctly found that the state had proved beyond a reasonable doubt that the (F)(5) aggravating factor of pecuniary gain exists.

## D. Remaining Aggravating Factors: A.R.S. Sections 13–703(F)(8) Other Homicides; (F)(9)—under age 15

¶ 57 We further agree with the trial court that the state proved beyond a reasonable doubt in each of the four murders the existence of the (F)(8) aggravating factor, that is, that defendant was convicted of one or more other homicides committed during the course of the murder. A.R.S. § 13–703(F)(8). The trial court noted that the murders were spatially, temporally, and motivationally connected. *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997). They occurred within a brief period, at the same house, and were part of a continuous course of conduct. *Lavers*, 168 Ariz. at 394, 814 P.2d at 351. We note also that, once proved, this aggravating factor applies to each first degree murder conviction. *State v. Greenway*, 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991).

¶ 58 We also agree that the state has proved beyond a reasonable doubt that Damien Luna was less than fifteen years of age at the time of his murder, thus establishing the existence of the (F)(9) aggravating factor.

## E. Mitigating Factors

¶ 59 The trial court expressly found that defendant failed to prove the statutory mitigating factors alleged and also failed to prove asserted non-statutory mitigators: post-arrest conduct, disadvantaged childhood, psychological disorder, remorse, adjustment to confinement, and acceptance of responsibility. Defendant challenges the court's findings regarding the factors of age, difficult family background, and remorse for the crime.

### 1. Age

¶ 60 A defendant may present his or her age as a mitigating factor under A.R.S. section 13–703(G)(5). Here, defendant was twenty-three years old when the murders were committed. This court has rejected age as a statutory mitigating cir-

cumstance in cases in which the defendant was substantially younger. *See, e.g., State v. Jackson,* 186 Ariz. 20, 31–32, 918 P.2d 1038, 1049–50 (1996) (age sixteen not mitigating factor); *State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (age twenty not mitigating factor); *State v. Gerlaugh,* 144 Ariz. 449, 460–61, 698 P.2d 694, 705–06 (1985) (age nineteen not mitigating factor). This court has held that "[c]hronological· age ... is not always dispositive of one's maturity," *Brewer,* 170 Ariz. at 507, 826 P.2d at 804, and that the court must also consider defendant's intelligence, maturity, past experience, and the extent and duration of the crime. *Id.; Jackson,* 186 Ariz. at 30, 918 P.2d at 1048. The trial court in this case found that defendant's age was not a mitigator because evidence was absent that he "lacked substantial judgment" and his temporary *pro se* representation established that he was capable of making reasoned decisions. We agree with these evidentiary findings and conclude that rejection of age as a statutory mitigating factor is also supported by defendant's intelligence level which tested as normal.

### 2. Difficult Family Background

¶ 61 Defendant claims that the trial court erred in refusing to give weight to a stressful family background and that not doing so violates the directive in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that the trial judge must consider all mitigating evidence proffered by defendant. This court has held that *Lockett* and *Eddings* require only that the sentencer consider evidence proffered for mitigation. *State v. Gonzales,* 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995), *cert. denied,* 516 U.S. 1052, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996). The sentencer, however, is entitled to give it the weight it deserves. *Id.* Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. Ross, 180 Ariz. at 607, 886 P.2d at 1362. The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that his family background had any effect on the crimes.

¶ 62 Defendant introduced evidence that he was separated from his mother at a young age and raised by a father who was cold and aloof. Defendant insisted, however, that he was not physically abused by his father, and no evidence was introduced to show otherwise. We conclude that defendant's family background, in light of the entire record, will not mitigate the death sentences imposed for these murders.

### 3. Remorse

¶ 63 A sense of remorse may be a mitigating circumstance. *Brewer,* 170 Ariz. at 507, 826 P.2d at 804. Defendant claims that, because his guilty pleas were an effort to spare the feelings of the remaining members of the Luna family and because statements in letters he wrote allegedly demonstrated remorse for the killings, the trial court erred in concluding that defendant felt no remorse.

¶ 64 On this record, we conclude that defendant has not proven remorse by a preponderance of the evidence. First, the evidence does not support defendant's contention that his guilty pleas were meant to spare the remaining members of the Luna family. Rather, as the trial court's special verdict correctly notes, the guilty pleas were a "tactical decision made in the face of overwhelming guilt."

¶ 65 Second, it is true that while in jail defendant wrote to friends that the Luna family "did not deserve that" and that he did not deserve to live. This argument is contradicted, however, by defendant's attempt to place the blame for the murders on his girlfriend, on the Glendale police, and on Albert Luna, Jr. Defendant also told the reporter that "under the right circumstance, he could kill again."

¶ 66 Defendant failed to prove remorse by a preponderance of evidence and failed to prove that he has accepted responsibility for his crimes.

### E. Summary of Aggravation/Mitigation Findings

¶ 67 The state has proved beyond a reasonable doubt the aggravating circum-

stances that each murder was committed in an especially cruel manner and for pecuniary gain. Each of the murders was committed during the commission of one or more other homicides. In addition, as an aggravating circumstance in Damien's murder, we find that defendant was an adult and the victim was under fifteen years of age. The defendant has failed to prove any statutory mitigating factors or any nonstatutory mitigating factors by a preponderance of the evidence. Because three aggravating circumstances exist (cruelty, pecuniary gain, other homicides) in three of the murders and the same three plus a fourth (victim under fifteen years) exist in the fourth murder and no statutory or nonstatutory mitigating circumstances have been adequately shown, we affirm each of the four death sentences imposed.

## DISPOSITION

¶ 68  Upon full review, we affirm defendant's convictions and sentences.

ZLAKET, C.J., and FELDMAN, MARTONE and MOELLER, (retired), JJ., concur.