984 P.2d 31

**STATE of Arizona, Appellee.**

v.

**George Russell KAYER, aka David Flynn, aka David Wortham, Appellant.**

**No. CR–97–0280–AP.**

Supreme Court of Arizona, En Banc.

June 29, 1999.

Janet Napolitano, Attorney General, by Paul J. McMurdie, Chief Counsel Criminal Appeals Division, John Pressley Todd, Assistant Attorney General, Phoenix, Attorneys for Appellee.

John M. Sears, Prescott, Attorney for Appellant.

## OPINION.

JONES, Vice Chief Justice.

¶1 A jury convicted defendant George Russell Kayer of first-degree murder for taking the life of Delbert L. Haas. The jury also convicted him of other felonies related to the killing. Because defendant was sen-tenced to death on the murder charge, direct appeal of all convictions and sentences to this court is mandatory pursuant to Rules 26.15 and 31.2(b) of the Arizona Rules of Criminal Procedure. Jurisdiction exists pursuant to article VI, section 5(3) of the Arizona Constitution and section 13–4031 of the Arizona Revised Statutes. We affirm the judgment and sentences imposed by the trial court.

### FACTS

¶2 On December 3, 1994, two couples searching for Christmas trees on a dirt road in Yavapai County discovered a body, later identified as Haas. Haas had been shot twice, evidenced by entry bullet wounds located roughly behind each ear. On December 12, 1994, Yavapai County Detective Danny Martin received a phone call from Las Vegas police officer Larry Ross. Ross told Martin that a woman named Lisa Kester approached a security guard at the Pioneer Hotel in Las Vegas and said that her boyfriend, the defendant, had killed a man in Arizona. Kester said a warrant had been issued for defendant's arrest in relation to a different crime, a fact Las Vegas police officers later confirmed. Kester gave Las Vegas police officers the gun she said was used to kill Haas, and she led the officers to credit cards belonging to Haas that were found inside a white van in the hotel parking lot. Kester appeared agitated to the police officers and security guards present and said she had not come forward sooner because she feared defendant would kill her, too. She asked to be placed in the witness protection program. She described defendant's physical appearance to the assembled officers and agreed to go with an officer to the police station.

¶3 A combination of Pioneer Hotel security guards and Las Vegas police officers soon spotted defendant leaving the hotel. The officers arrested defendant and took him to the police station for questioning. Kester had already been arrested for carrying a concealed weapon. Detectives Martin and Roger Williamson flew to Las Vegas on December 13 to interrogate Kester and the defendant. Kester gave a complete account

of events that she said led to Haas' death. Defendant, in contrast, spoke briefly with the detectives before invoking his *Miranda* right to have an attorney present. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 4 Kester's statements to Detectives Martin and Williamson formed the basis of the State's prosecution of defendant. She said that defendant continually bragged about a gambling system that he had concocted to defeat the Las Vegas casinos. However, neither defendant nor Kester ever had money with which to gamble. Defendant was a traveling salesman of sorts, selling T-shirts, jewelry, and knickknacks. His only other income came from bilking the government of benefits through fake identities that both defendant and Kester created. Defendant learned that Haas recently received money from an insurance settlement. Kester and defendant visited Haas at his house near Cordes Lakes late in November 1994. Kester said that defendant convinced Haas to come gambling with them. On November 30, 1994, defendant, Kester, and Haas left for Laughlin, Nevada in defendant's van.

¶ 5 The trio stayed in the same hotel room in Laughlin, and after the first night of gambling, defendant claimed to have "won big." Haas agreed to loan the defendant about $100 of his settlement money so that defendant could further utilize his gambling system. Defendant's gambling system proved unsuccessful, and he promptly lost all the money Haas had given him. However, defendant told Haas again that he had won big but that someone had stolen his winnings. Kester asked defendant what they were going to do now that they were out of money. Defendant said he was going to rob Haas. When Kester asked how defendant was going to get away with robbing someone he knew, defendant said, "I guess I'll just have to kill him."

¶ 6 The three left Laughlin to return to Arizona on December 2, 1994. On the road, all three—but mostly Haas—consumed alcohol. Defendant and Haas argued continually over how defendant was going to repay Haas. The van made several stops for bathroom breaks and to purchase snacks. At one of these stops, defendant took a gun that he stored under the seat of the van and put it in his pants. Defendant asked Kester if she was "going to be all right with this." Kester said she would need a warning before defendant killed Haas.

¶ 7 Defendant charted a course through back roads that he claimed would be a shortcut to Haas' house. While on one such road, defendant stopped the van near Camp Wood Road in Yavapai County. At this stop, Kester said Haas exited the van and began urinating behind it. Kester started to climb out of the van as well, but defendant motioned to her with the gun and pushed her back into the van. The van had windows in the rear and on each side through which Kester viewed what occurred next. Defendant walked quietly up to Haas from behind while he was urinating, trained the gun at Haas' head at point-blank range, and shot him behind the ear. Defendant dragged Haas' body off the side of the road to the bushes where the body was eventually found. Defendant returned to the car carrying Haas' wallet, watch, and jewelry.

¶ 8 Defendant and Kester began to drive away in the van when defendant realized that he had forgotten to retrieve Haas' house keys. He turned the van around and returned to the murder scene. Kester and defendant both looked for the body; Kester spotted it and then returned to the van. Defendant returned to the van, too, and asked for the gun, saying that Haas did not appear to be dead. Kester said defendant approached Haas' body and that she heard a second shot.

¶ 9 Kester and defendant then drove to Haas' home. Defendant entered the home and stole several guns, a camera, and other of Haas' personal property. He attempted unsuccessfully to find Haas' bank PIN number in order to access Haas' bank accounts. Defendant and Kester sold Haas' guns and jewelry at pawn shops and flea markets over the course of the next week, usually under the aliases of David Flynn and Sharon Hughes. Defendant and Kester went to Las Vegas where defendant used the proceeds from selling these items to test his gambling

system once again and to pay for a room at the Pioneer Hotel. At this time, Kester approached the Pioneer Hotel security guard and reported defendant's crime.

## PROCEDURAL HISTORY

¶ 10 On December 29, 1994, a Yavapai County grand jury indicted both defendant and Kester. Both were charged with: (1) premeditated first-degree murder, (2) felony first-degree murder, (3) armed robbery, (4) residential burglary, (5) theft, (6) trafficking in stolen property, and (7) conspiracy. In February 1995, the State filed a notice that it would be seeking the death penalty against both defendant and Kester.

¶ 11 In September 1995, as trial approached, Kester entered into a plea agreement with the State. The plea agreement required Kester to verify "that all prior statements made to [Yavapai County Detectives Martin and Williamson in December 1994] were truthful." It also required Kester to "appear at any proceeding including trial upon the request of the State and testify truthfully to all questions asked." It mandated that Kester "cooperate completely with the State of Arizona in the prosecution of" defendant, and it allowed the State to dishonor the agreement if Kester violated any term or condition. In return for these promises, Kester was charged with facilitation to commit first-degree murder, facilitation to commit residential burglary, and facilitation to commit theft/trafficking in stolen property. These crimes are class 5 and class 6 felonies and carry significantly lesser penalties than the murder and felony charges with which Kester had been charged.

¶ 12 As the trial date approached and after the State's attorney and defendant's originally appointed attorney had engaged in substantial pretrial activity, defendant became disenchanted with his attorney and refused to cooperate any further. The trial judge was forced to appoint new counsel for defendant, delaying the trial for nearly a year. The State dropped all conspiracy charges, and defendant was eventually tried in March 1997. At trial, defendant's entire defense centered on a claim that Kester—not defendant—had killed Haas and was now

framing defendant for the murder. The State presented extensive evidence, including forensic evidence, that corroborated Kester's testimony and discredited defendant's testimony. The jury found defendant guilty on all charges.

¶ 13 Upon being found guilty, defendant made clear his desire to expedite the sentencing process. The trial judge scheduled the initial conference to discuss sentencing procedures for May 16, 1997, about seven weeks after defendant's trial ended. Defendant reluctantly agreed to continue the initial sentencing conference until June 6 to allow a court-appointed mitigation specialist, Mary Durand, to begin working with him. An aggravation/mitigation hearing was scheduled for June 24 with sentencing to follow July 8. Durand sought to interview defendant, his family members, and others in order to discover genetic, physical, and/or psychological impairments that might explain defendant's behavior and thus provide mitigating evidence that might affect whether the death penalty or a life sentence should be imposed. After learning of Durand's goals with respect to him, defendant refused to cooperate.

¶ 14 At the June 6, 1997 sentencing conference, defendant's counsel stated that Durand wanted a minimum of ninety more days to evaluate defendant. Defendant wanted to proceed with sentencing immediately and expressed his refusal to cooperate with Durand. The judge, defendant's counsel, and defendant all expressed a belief that defendant was competent and followed his wish to press forward with sentencing. However, the judge moved the aggravation/mitigation hearing from June 24 to July 8, which required moving sentencing from July 8 to July 15 in order to allow Durand more time with defendant.

¶ 15 At both the aggravation/mitigation hearing and the sentencing hearing, the judge again asked if defendant had reconsidered and would like more time to allow Durand to investigate potential mitigating evidence. Each time, defendant refused the offer and stated he would not cooperate with

Durand no matter how long sentencing was delayed.

¶ 16  On July 15, 1997, the trial judge sentenced defendant to death for the first-degree murder and felony murder charges, thirty-five years in prison for the armed robbery and trafficking in stolen property charges, twenty-five years in prison for the residential burglary charge, and just under six years for the theft charge.  All sentences were aggravated and consecutive, except the theft charge, which the court ordered to be served concurrent with the trafficking in@ stolen property offense but consecutive to the residential burglary offense.  The judge found that the state established two aggravating factors beyond a reasonable doubt— previous conviction of a "serious offense" pursuant to A.R.S. § 13–703(F)(2) and committing murder for pecuniary gain pursuant to A.R.S. § 13–703(F)(5).  The judge found that defendant established no statutory mitigating factors under A.R.S. § 13–703(G) and found the presence of only one nonstatutory mitigator—defendant's importance in the life of one of his children.  After weighing the aggravating and mitigating factors, the judge imposed the death sentence, expressly finding that by failing to cooperate with Durand, defendant hampered his own ability to present mitigating evidence that might have reduced his sentence to life imprisonment.

## ISSUES

### I.  Kester's Plea Agreement

¶ 17  Defendant argues that Kester's plea agreement violated his federal and state constitutional rights against being tried and convicted without due process of law.  In *State v. Fisher*, 176 Ariz. 69, 73, 859 P.2d 179, 183 (1993), this court held that plea agreements must "properly be conditioned upon truthful and complete testimony."  In contrast, "consistency provisions," which require that testimony at trial "will not vary substantially in relevant areas to the statements previously given to investigative officers," are invalid.  *Id.* Defendant claims that Kester's agreement contained a consistency provision, barred by *Fisher*, because it improperly coerced Kester to testify against him and prevented her from ever recanting her story

unless she wanted to face the death penalty again.

¶ 18  Defendant did not object to the form of the agreement at trial.  Instead, defendant's attorney cross-examined Kester with respect to the agreement in an attempt to impeach her credibility as a witness.  Because no objection was made to Kester's plea agreement at trial, we review the claim only for fundamental error.  *See State v. Cook*, 170 Ariz. 40, 58, 821 P.2d 731, 749 (1991).

¶ 19  In *Cook*, we addressed a similar claim regarding "consistency provisions" in a plea agreement.  Drawing an analogy to claims of ineffective assistance of counsel, we determined that this court was not the forum to challenge a plea agreement for the first time because "the trial court has not had the opportunity to conduct an evidentiary hearing on the question and to develop a record on the issue for us to examine on appeal."  *Id.* We determined that when no objection is made at trial, this court, on direct appeal, can neither determine whether fundamental error has been committed, nor can we, in the absence of an evidentiary record, review the alleged "consistency provisions" in the plea agreement.  The "preferred procedure" is to attack the agreement in a proceeding for post-conviction relief.  *Id.* at 58–59, 821 P.2d at 749–50.

¶ 20  Defendant's claim suffers the same deficiencies decried in *Cook*.  No objection was made before trial or at trial to the form of Kester's plea agreement.  Thus, the trial court was not able to conduct an evidentiary hearing with respect to the plea agreement and its validity.  In fact, instead of objecting to the form of the plea agreement, defendant's own attorneys insisted that the plea agreement, which defendant now attacks on appeal, be entered into evidence when State attorneys appeared content to have Kester recite excerpts of the agreement's terms into the record.  Trial counsel must object to a potentially invalid plea agreement at the trial level in order for this court, on appeal, to assess whether the agreement runs afoul of our holding in *Fisher* as well as

our subsequent analysis and holding in *Cook*.[1]

## II. Jury Selection

■ ¶ 21 Defendant argues that the jury selection process violated his federal and state constitutional rights to be tried by an impartial and representative jury. *See* U.S. Const., amend. VI; Ariz. Const. art. II, § 24. Defendant asserts two broad claims in this regard. First, he argues that the "death qualification" procedures used by the trial judge created a jury that was biased against him and was prone to impose the death penalty. Second, he contends that the court improperly dismissed one juror who expressed reservations about serving as a juror in a case that could result in a death sentence.

### A. Death Penalty Questioning

¶ 22 Defendant's general attack on the use of any questions addressing the death penalty is subject to *de novo* review to assess whether the judge's questions were allowable under Arizona law. *See State v. Hyde*, 186 Ariz. 252, 278, 921 P.2d 655, 681 (1996); *cf. State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997) (requiring jury instructions accurately to state the law). In *State v. Martinez–Villareal*, 145 Ariz. 441, 702 P.2d 670 (1985), we discussed voir dire questioning related to a juror's personal views of the death penalty:

> We have expressly held that jury questioning regarding capital punishment is permissible where the questioning determines bias of a nature which would prevent a juror from performing his duty. Under the procedure used in Arizona in death penalty cases, the jurors' duty is to determine guilt or innocence, while the sentence of death is solely the responsibility of the trial judge. Nevertheless, **voir dire questioning related to a juror's views on capital punishment is permitted to determine whether those views would prevent or substantially impair the performance of the juror's duties to**

**decide the case in accordance with the court's instructions and the juror's oath.**

*Id.* at 449, 702 P.2d at 678 (emphasis added). We have reiterated this holding several times. *See State v. Stokley*, 182 Ariz. 505, 514, 898 P.2d 454, 463 (1995) (finding that death-qualification questioning does not constitute error, "fundamental or otherwise"); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992) (finding that the death-qualification issue had been waived, but "there is, in any event, no error, fundamental or otherwise"); *State v. Atwood*, 171 Ariz. 576, 624, 832 P.2d 593, 641 (1992) (impartial jury requirement is fulfilled when conscientious jurors are selected, quoting *Martinez–Villareal*). The United States Supreme Court standard under the Sixth Amendment is identical to that stated by this court in *Martinez–Villareal. See Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (juror could be dismissed for cause upon a showing that the juror's views with respect to the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581, (1980)); *State v. Detrich*, 188 Ariz. 57, 65, 932 P.2d 1328, 1336 (1997) (observing that Arizona follows the federal standard stated in *Wainwright*).

¶ 23 The court's voir dire questioning in the instant case followed the strictures of federal and Arizona law. The trial judge questioned the jurors in groups of three and asked each juror, "[K]nowing what your duty as a juror is, do you believe that this kind of a case [a potential death penalty case] would be such that you could not be a fair and impartial juror?" Upon receiving confirmation that a particular juror would be fair and impartial, as mandated by a juror's oath, the judge asked no further questions regarding the death penalty. We find no error in·the court's questions.

### B. Juror DeMar

■ ¶ 24 Only one juror was excused as a result of the death-qualification ques-

---

1. Given our resolution of this issue, we do not decide whether Kester's plea agreement includes a "consistency provision" of the kind we held unenforceable in *Fisher*.

tioning—Juror Ed DeMar. Defendant challenges DeMar's dismissal. We have held that a general objection to death penalty questioning does not serve as an objection to preserve on direct appeal the issue of whether individual jurors were improperly dismissed for cause because of their death penalty views. *See Detrich,* 188 Ariz. at 65, 932 P.2d at 1336. Because defendant failed specifically to object to Juror DeMar's dismissal, we review DeMar's dismissal only for fundamental error. *See id.*

¶ 25   In response to death-penalty questioning by the court, DeMar expressed some concern about a proceeding that might lead to the death penalty. Rather than have DeMar explain further in front of the other two jurors present, the judge asked DeMar to step outside for a moment so that questioning could continue with the other two jurors who had expressed no concern regarding the death penalty. DeMar later was brought before the judge alone, and this exchange took place:

> **Court:** So we are talking about whether or not you had any personally-held beliefs, philosophical opinions, or religious convictions that would get in the way and make it difficult or impossible for you to be a fair and impartial juror knowing that the death penalty was a possibility.
>
> **DeMar:** Yes. That would be a—I would have reservations about an action in which the death penalty might be imposed or could be imposed.
>
> . . . .
>
> **Court:** And would it get in your way, then, of being a fair and impartial juror as the process continued?
>
> **DeMar:** It might, again depending on what—how much of a factor became evidence in testimony and what have you.
>
> **Court:** Okay.
>
> **DeMar:** But it would not be—be a hands-down opposition to the death penalty as such.
>
> **Court:** I understand what you're saying, and of course at this point we are looking for whether or not you can work in this trial as a fair and impartial juror to both defendant and the State.

> **DeMar:** I understand.
>
> **Court:** Let me—let me try it this way, to—knowing what you know right now, knowing your personal opinions and beliefs and what you know the job of the juror to be, because this is a possibility of a death penalty case at this point, would you like me to excuse you from jury duty in this case?
>
> **DeMar:** I think that probably would be fair to the—to the State and to the defense, both really, since that reservation is honestly held.
>
> **Court:** Okay. Okay.
>
> Mr. DeMar, I'm going to accept what you tell me. I'm going to thank you for spending now a day and a half with us and putting up with all of our questioning, and I'm going to excuse you from jury duty in this case, with our sincere appreciation.

¶ 26   This exchange makes clear that the judge was willing to allow DeMar to continue as a potential juror upon a simple assurance that DeMar could be fair and impartial. Because DeMar could not give such an assurance, he accepted the court's decision that he be excused from the jury panel in order to be fair to both the defendant and the State.

¶ 27   Similarly, our case law is clear that a trial judge must excuse any potential jurors who cannot provide assurance that their death penalty views will not affect their ability to decide issues of guilt. *See Detrich,* 188 Ariz. at 65, 932 P.2d at 1336 (urging as "imperative" the dismissal of any juror who cannot assure impartiality on guilt issues because of views regarding the death penalty (citing *State v. Hyde,* 186 Ariz. 252, 921 P.2d 655 (1996))). Thus, the trial court did not err in asking DeMar questions regarding the death penalty, nor did the court err in allowing DeMar to be excused from jury service given the presence of "honestly held" reservations regarding the death penalty that might have affected DeMar's ability to carry out his oath with respect to issues of guilt.

## III.   Sentencing Issues

¶ 28   In assessing the propriety of a death sentence, this court reviews indepen-

dently the findings of the trial court regarding aggravating and mitigating circumstances. *See* A.R.S. § 13–703.01; *State v. Djerf,* 191 Ariz. 583, 595, 959 P.2d 1274, 1286 (1998); *State v. Jones,* 185 Ariz. 471, 492, 917 P.2d 200, 221 (1996); *State v. Roscoe,* 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The State must prove the existence of statutory aggravating factors beyond a reasonable doubt. *See State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992). Defendant has the burden of presenting and proving mitigating circumstances—statutory and nonstatutory—by a preponderance of the evidence. *See id.* at 504, 826 P.2d at 801; *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994). On appeal, this court must determine whether defendant's mitigating evidence, assessed separately or cumulatively, outweighs aggravating evidence presented by the State. *See Djerf,* 191 Ariz. at 595, 959 P.2d at 1286; *Brewer,* 170 Ariz. at 500, 826 P.2d at 797.

### A. Aggravating Circumstances

¶ 29    At trial, the State argued that three aggravating circumstances under section 13–703 applied to defendant. The court determined the State proved the existence of two such circumstances beyond reasonable doubt—sections 13–703(F)(2) and 13–703(F)(5).

### 1. A.R.S. § 13–703(F)(2): Previous Conviction of a Serious Offense

¶ 30    Defendant argues the trial court improperly found that he "was previously convicted of a serious offense, whether preparatory or completed." A.R.S. § 13–703(F)(2) (Supp.1998). The legislature amended the (F)(2) factor in 1993. Prior to the amendment, (F)(2) was established if "[t]he defendant ha[d] been convicted of a felony in the United States involving the use or threat of violence on another person." The language "use or threat of violence" proved nebulous and difficult to apply, which led to the 1993 amendment and the addition of subsection (H). *See State v. Rienhardt,* 190 Ariz. 579, 589, 951 P.2d 454, 464 (1997); *State v. Walden,* 183 Ariz. 595, 616 & n. 10, 905 P.2d 974, 995 & n. 10 (1995). Subsection

(H) enumerates "serious offense[s]" that trigger the (F)(2) aggravator. Because Haas was murdered in 1994, the amended version of (F)(2), with the subsection (H) enumeration, applies. *See Rienhardt,* 190 Ariz. at 589, 951 P.2d at 464.

¶ 31    Section 13–703(H)(9) declares that burglary in the first degree is a "serious offense" that qualifies as a predicate to the (F)(2) aggravator. The State presented documentation of defendant's 1981 conviction of first-degree burglary. Based on this documentation, the court determined the (F)(2) aggravator had been proved beyond a reasonable doubt. The State thus met its burden of showing that defendant had been previously convicted of a "serious offense" under section 13–703(F)(2).

### 2. A.R.S. § 13–703(F)(5): Pecuniary Gain

¶ 32    Defendant challenges the trial court's finding that the State proved the "pecuniary gain" factor beyond a reasonable doubt. This aggravator exists when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5). To establish (F)(5), "pecuniary gain [must be] a motive, cause, or impetus for the murder and not merely the result of the murder." *State v. Spears,* 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996). *See also State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993); *State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (noting that pecuniary gain does not exist in every case where "a person has been killed and at the same time defendant has made a financial gain").

¶ 33    The State can establish pecuniary gain beyond reasonable doubt through presentation of direct, tangible evidence or through strong circumstantial evidence. *See State v. Greene,* 192 Ariz. 431, 439, 967 P.2d 106, 114 (1998); *State v. Hyde,* 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). A financial motive need not be the only reason the murder was committed for the pecuniary gain aggravator to apply. *See Greene,* 192 Ariz. at 438–39, 967 P.2d at 113–14; *State v. Soto–Fong,* 187 Ariz. 186, 208, 928

P.2d 610, 632 (1996); *Hyde,* 186 Ariz. at 280, 921 P.2d at 683 ("Pecuniary gain need not be the exclusive cause for a murder" in order to satisfy (F)(5)); *State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991) (motive of witness elimination did not foreclose the possibility of finding an additional motive to commit murder for pecuniary gain).

¶ 34   The State proved pecuniary gain in this case beyond a reasonable doubt. Kester and other witnesses testified that defendant continually bragged about his gambling system and observed his addictive behavior of constantly wanting money with which to gamble. Kester testified that defendant said he planned to steal from Haas and then kill him so that defendant could get away with killing someone he knew. Defendant took Haas' money, credit cards, and other personal items from the crime scene. Kester testified that defendant also took Haas' house keys after the murder, entered the home, and stole several additional items of personal property. Another witness at trial observed Kester and defendant at Haas' home at about the time established by Kester. Pawn shop receipts and witness testimony established that after Haas was murdered, defendant sold virtually all of Haas' jewelry and guns. In short, the State presented overwhelming circumstantial and direct evidence that defendant killed with the expectation of pecuniary gain. This proof far exceeds the requirement that pecuniary gain must be only a motive for the crime.

## B.   Mitigating Circumstances

¶ 35   Defendant offered seven mitigating circumstances, one statutory and six nonstatutory, for the court to consider at the sentencing hearing: (1) intoxication causing an inability to appreciate the wrongfulness of his conduct under A.R.S. § 13–703(G)(1), (2) intoxication not rising to the level of establishing the statutory (G)(1) mitigator, (3) defendant's military record, (4) the disparity in sentences between defendant and Kester, (5) defendant's poor health, (6) defendant's intelligence and ability to contribute to society, and (7) defendant's devotion to his youngest child. The court found the existence of only

one mitigating factor—the importance of defendant in the life of his son.

¶ 36   Defendant argues on appeal that in addition to these factors, the court should have: (1) forced defendant to cooperate with his court-appointed mitigation specialist, (2) found defendant mentally impaired, and (3) considered *sua sponte* the high cost of execution as a mitigating circumstance.

### 1.   Failure to Cooperate with a Court–Appointed Mitigation Expert

¶ 37   Defendant repeatedly refused to cooperate with his court-appointed mitigation specialist and instead sought to expedite sentencing. He now argues the trial court erred when it allowed him this freedom. On appeal, defendant characterizes his refusal as legal incompetence or improper control over the presentation of mitigation evidence that amounts to a *de facto* and improper waiver of his right to counsel. We disagree.

### a.   Competency

¶ 38   A defendant is deemed legally competent if he or she has demonstrated an ability to make a reasoned choice among alternatives, with an understanding of the consequences of the choice. *See State v. Brewer,* 170 Ariz. 486, 495, 826 P.2d 783, 792 (1992) (citing *Sieling v. Eyman,* 478 F.2d 211, 215 (9th Cir.1973)); *State v. Bishop,* 162 Ariz. 103, 781 P.2d 581 (1989); *State v. Pierce,* 116 Ariz. 435, 569 P.2d 865 (App. 1977). For a defendant's choice to be found competent, proof must exist that the defendant's decision was voluntary, knowing, and intelligent. *See Djerf,* 191 Ariz. at 592, 959 P.2d at 1283 (discussing competency as it relates to a decision to waive counsel). Competent choices are not to be equated with wise choices; competent defendants are allowed to make choices that may not objectively serve their best interests. *See Brewer,* 170 Ariz. at 495, 826 P.2d at 792.

¶ 39   Defendant's competency claim centers on certain snippets of dialogue he was allowed to interject at various sentencing hearings wherein he referred to UFOs and biblical passages. At the June 6 preliminary sentencing hearing, defendant referred to a heart attack he suffered two months before

Haas was murdered, saying that "[i]n October of 1994, in Oklahoma City in the emergency room, I expired. I died. I was brought back to life." Later during this same hearing, defendant again spoke about his decision not to cooperate with Durand and with his desire to expedite sentencing:

I think one of the points that needs to be brought out is that none of us know [sic] what is right. One of the things that God didn't instill in human beings is the ability to judge. We can't see around the corner. . . .

I think that . . . an example of this is to be found in the Bible where it says every hair on your head is counted. I've been grabbed by the balls and drug here by destiny, and I don't know what's going to be around the corner any more than anybody else here does. But I think it's important to the Court that the Court understands just a little of where I'm at, and hear it from me instead of a specialist or the counsel or presentence report lady.

And that's really all I have to say. Thank you.

¶ 40 At the July 8 aggravation/mitigation hearing, defendant addressed the court after all the aggravation and mitigation evidence had been presented:

I've been convicted of a murder, premeditated, a murder to rob—the people of Arizona through their laws say perhaps I should be murdered, premeditated, by the State. An eye for an eye, . . . the death penalty it's now called.

That kind of amazes me, because I've lived—lived in a dorm full of men for two years and nine months, and it's—excuse me—it's rare to see them agree on anything, even as bad as the food is. I have had to ask myself what reason could I possibly have that 70 percent of the people would understand, what reason did I have for that? Sixteen [sic] jurors that found me guilty. What reason did I have for the judge passing sentence on me? I didn't have one.

I had a lot of reasons, but I was seeking [something] deeper, something profound, yet simple, something that would reach the very center of the people involved. Four

days ago I still didn't have one, and the reason that I was seeking—I haven't been able to sleep very well lately, and I awoke about an hour into the 4th of July, restless, still wondering what I would say or do on this very day.

I reached over and picked up the Bible. I don't read the Bible a lot, but I was given the reason. It was profound and simple, and astonishingly from the very source the people of Arizona find an eye for an eye. The source is, of course, the Old Testament, Deuteronomy 19, but before I reached the Verse 21, an eye for an eye, I ask you to back up and look at Verse 15. And I quote:

"One witness shall not rise up against a man, but by the mouths of two or three witnesses the matter shall be established."

Beware of one witness wherein the source the people use. Beware of one witness that would lie—or, excuse me—that would die if she didn't lie. Beware of one witness who in her presentence report on page 9 said she spent all her thousands of money that she received on drugs before she met me, then lied during the trial saying I gambled away four or five thousand of her money.

Beware of one witness that offered to sell her soul to Detective Dan Martin for $100 a week in an apartment until the trial, but only after the tape recorder was turned off. She didn't know the video camera was running in the video room. On March 13th, 1997, 10,000 people in Arizona saw seven UFO's over Phoenix; 11 people came forward with a videotape of this. And the government says it didn't happen.

Yet one witness, one ex-drug addict, one witness, staring down the barrel of the death penalty herself but is getting probation, one witness is good enough for the same government to kill me. Somebody needs to wake up and change the channel, because there's definitely something wrong with that picture.

There's one other thing that I'd like to say, and that's—I really regret not going

to the authorities when this initially happened.

Thank you.

¶ 41 After thoroughly reviewing the entire record, we conclude that defendant was competent when he decided not to cooperate with Durand. Taken in context, these bizarre passages quoted do not refute but rather bolster the conclusion that defendant was intelligent, had an understanding of what was occurring, and voluntarily made the decision not to cooperate. He understood the alternatives and the consequences of refusing to cooperate and nevertheless chose that path. He reaffirmed his decision not to cooperate several times, once saying that he did not have a death wish but that he believed the psychological evidence Durand wished to pursue would not produce mitigating evidence. Significantly, defendant's own attorneys expressed on the record a belief that defendant understood his choices and the consequences of those choices. *See Djerf,* 191 Ariz. at 592, 959 P.2d at 1283 (noting that attorneys' assurances of competence were significant to the competency issue).

¶ 42 The trial judge, too, stated that defendant understood the proceedings and the consequences of his choices. Defendant was evaluated pursuant to Rule 11, Arizona Rules of Criminal Procedure, before his trial started and was deemed competent to stand trial at that time. Nothing occurred in the interim to question the validity of this determination or to suggest that a new evaluation was necessary. *See* 17 A.R.S. Rules of Crim. Proc., Rule 26.5 (providing trial judges with discretion to order a mental health or diagnostic examination at any time before a sentence is pronounced); *cf. Roscoe,* 184 Ariz. at 498, 910 P.2d at 649 (subjecting defendant to two mental health examinations after repeated suicide attempts). The record indicates that defendant was articulate, aware of the proceedings, and knowledgeable about the potential consequences of his choices. On this record, we conclude that defendant was competent when he chose not to cooperate with Durand and chose to expedite his sentencing proceedings, despite the fact that his decision may have limited the mitigation evidence offered on his behalf.

#### b. Waiver of Mitigation Evidence

¶ 43 Defendant argues that even if he was competent, the trial judge improperly allowed him to control the presentation of mitigation evidence. Defendant relies heavily on our decision in *State v. Nirschel,* 155 Ariz. 206, 745 P.2d 953 (1987) to support his argument. In *Nirschel,* we held that three decisions are exclusively within the province of the defendant: (1) whether to plead guilty, (2) whether to waive a jury trial, and (3) whether to testify. *See id.* at 208, 745 P.2d at 955. "Beyond these matters, most trial decisions are matters of trial strategy resting with counsel." *Id.* (emphasis added).

¶ 44 *Nirschel,* which specifically addressed the attorney's right to control a motion to suppress, does not preclude a defendant from refusing to cooperate with a mitigation specialist. We have stated that a competent defendant can waive counsel altogether. *See Djerf,* 191 Ariz. at 592, 959 P.2d at 1283. A defendant's right to waive counsel includes the ability to represent himself or herself at the sentencing phase of a case that could result in the death penalty. *See State v. Henry,* 189 Ariz. 542, 550, 944 P.2d 57, 65 (1997).

¶ 45 In *State v. Roscoe,* we allowed the defendant to control whether or not mitigation evidence regarding two prior suicide attempts was presented, determining that this freedom was "especially appropriate . . . where the client's request involves a strong privacy interest." 184 Ariz. 484, 499, 910 P.2d 635, 650 (1996). The United States Supreme Court has upheld a defendant's right to waive all mitigating evidence. *See Blystone v. Pennsylvania,* 494 U.S. 299, 306 & n. 4, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (no constitutional violation occurred when a defendant was allowed to waive all mitigation evidence after repeated warnings from the judge and advice from counsel). Thus, read in context with other cases, *Nirschel* cannot be seen as providing an exclusive list of the areas in which a defendant's decision controls, especially since *Nirschel* 's list does not include the *Roscoe* right to waive mitigation evidence. An anomaly would exist were we to accept defendant's argument that counsel

exclusively controls the presentation of all mitigation evidence: a defendant could waive counsel at sentencing and thereby have exclusive control over the presentation of all mitigation evidence; yet if a defendant accepts counsel, he would have no input on what mitigating factors to offer.

¶ 46 Far from creating such an anomaly, our case law allows defendant the freedom not to cooperate with a mitigation specialist and thereby potentially limit the mitigation evidence that is offered. Significantly, defendant stressed to the trial judge that he wanted Durand to advocate on his behalf at the mitigation hearing. Defendant also wanted his attorneys to argue other mitigating evidence. Consequently, seven mitigating circumstances were offered. Durand testified on defendant's behalf, albeit without defendant's full cooperation. Defendant was not conceding defeat; he wanted advocacy in all areas except the psychological areas that Durand wanted to explore. Just as the defendant in *Roscoe* "got exactly what he wanted" when the trial judge honored his request and thereby potentially limited the mitigating evidence that was offered, so, too, did the defendant here. 184 Ariz. at 499, 910 P.2d at 650.

¶ 47 We conclude that the trial court properly allowed defendant not to cooperate with the court-appointed mitigation specialist, given the repeated warnings of the consequences of this decision and the factual record before us.

**2. A.R.S. § 13–703(G)(1): Inability to Appreciate Wrongfulness of Conduct**

¶ 48 Defendant argues that Durand's testimony and information from defendant's Rule 11 pretrial mental health evaluation combined to establish the (G)(1) mitigating factor—that "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Defendant argues that his history of mental illness, including a history of suicide ideation, a history of alcoholism in his family, and his own polysubstance abuse, establishes the existence of

this mitigating factor under the preponderance standard.

¶ 49 Voluntary intoxication or substance abuse can be a mitigating factor that supports a(G)(1) finding. *See State v. Stokley*, 182 Ariz. 505, 520, 898 P.2d 454, 469 (1995) (intoxication); *State v. Medrano*, 185 Ariz. 192, 194–95, 914 P.2d 225, 227–28 (1996) (substance abuse). Proving a mental illness by a preponderance of the evidence also may establish the (G)(1) mitigator. *See State v. Bolton*, 182 Ariz. 290, 313, 896 P.2d 830, 853 (1995); *State v. (Rudi) Apelt*, 176 Ariz. 369, 377, 861 P.2d 654, 662 (1993); *Brewer*, 170 Ariz. at 505, 826 P.2d at 802. However, personality or character disorders usually are not sufficient to satisfy this statutory mitigator. *See Bolton*, 182 Ariz. at 313, 896 P.2d at 853; *Apelt*, 176 Ariz. at 377, 861 P.2d at 662. A defendant must show a causal link between the alcohol abuse, substance abuse, or mental illness and the crime itself in order to meet the preponderance standard. *See State v. Henry*, 189 Ariz. 542, 552–53, 944 P.2d 57, 67–68 (1997); *State v. Jones*, 185 Ariz. 471, 492, 917 P.2d 200, 221 (1996); *Apelt*, 176 Ariz. at 377, 861 P.2d at 662. A trial judge has broad discretion to determine the credibility and weight of evidence offered to support the (G)(1) mitigator, especially mental health evidence. *See State v. Doerr*, 193 Ariz. 56, 69, 969 P.2d 1168, 1181 (1998); *Ramirez*, 178 Ariz. at 131, 871 P.2d at 252.

¶ 50 Defendant did not establish as threshold evidence the existence of any of these factors, let alone their influence on preventing him from conforming his conduct to the law or appreciating the wrongfulness of his conduct. Defendant's Rule 11 mental health evaluation revealed no impairment that would prevent him from standing trial. His court-appointed mitigation specialist did not identify the existence of any mental illness with the certainty required to establish this mitigating circumstance. Further, he offered no proof that he was intoxicated or impaired at the time of the murder.

¶ 51 He also offered no proof that his past polysubstance abuse prevented him from conforming his conduct to the law or appreciating its wrongfulness when the mur-

der occurred. We have consistently held, and we hold now, that voluntary intoxication, polysubstance abuse, or claimed mental illness will not satisfy the (G)(1) mitigator when the evidence, as here, is speculative, conflicting, or nonexistent. *See State v. Tankersley*, 191 Ariz. 359, 372, 956 P.2d 486, 499 (1998) (alcohol may have caused some impairment, but not enough to meet the (G)(1) mitigator); *Rienhardt*, 190 Ariz. at 591–92, 951 P.2d at 466–67 (no evidence offered that could establish the level of intoxication); *State v. Schackart*, 190 Ariz. 238, 251, 947 P.2d 315, 328 (1997) (mental health expert offered inconclusive evidence related to mental illness); *State v. Spreitz*, 190 Ariz. 129, 149–50, 945 P.2d 1260, 1280–81 (1997) (long-time substance abuse problems insufficient to establish the (G)(1) mitigator); *State v. Jones*, 188 Ariz. 388, 400, 937 P.2d 310, 322 (1997) (insufficient evidence to show methamphetamine use impaired conduct on the day of the murder); *State v. Thornton*, 187 Ariz. 325, 335, 929 P.2d 676, 686 (1996) (expert testimony conflicted with respect to mental illness; (G)(1) not established); *State v. Miller*, 186 Ariz. 314, 326, 921 P.2d 1151, 1163 (1996) (defendant's ability to drive after the murder discredited any assertion that intoxication existed to establish (G)(1) mitigator); *State v. Medrano*, 185 Ariz. 192, 194–95, 914 P.2d 225, 227–28 (1996) (self-reported use of cocaine on day of murder not enough to establish (G)(1) mitigator); *Bolton*, 182 Ariz. at 313, 896 P.2d at 853 (insufficient evidence to establish mental illness, despite two psychiatric experts' testimony on defendant's behalf); *State v. King*, 180 Ariz. 268, 282, 883 P.2d 1024, 1038 (1994) (nothing in the record showed intoxication or level of intoxication).

### 3. Mental Impairment as a Nonstatutory Mitigator

¶ 52 Defendant's alleged mental impairment on the day he murdered Haas, whether attributed to historical substance abuse or a mental disorder, also must be considered as a nonstatutory mitigating circumstance. *See Jones*, 185 Ariz. at 491, 917 P.2d at 220 (mental health disorders); *State v. Gallegos*, 178 Ariz. 1, 18–19, 870 P.2d 1097, 1114–15 (1994) (intoxication); *State v. Kiles*, 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993)

(intoxication/substance abuse); *Brewer*, 170 Ariz. at 505, 826 P.2d at 802 (character and personality disorders weighed as nonstatutory mitigating evidence). The trial judge limited his discussion of impairment to impairment caused by intoxication. Our discussion of impairment, however, includes the mental health considerations urged on appeal. In the special verdict form, the trial judge referred to defendant's past diagnosis and treatment for a bipolar or manic depressive condition. The judge noted that defendant had consumed some beer on the trip back to Haas' home and that defendant had historically been a polysubstance abuser. The court discussed defendant's Rule 11 evaluation before trial, which "found some unusual results in the MMPI and some possible problems with paranoia." The judge referred to an incident that occurred before Haas' murder where defendant once carried a cyanide pill to a mental health evaluation. Defendant told the doctor that he brought the pill in case he needed it to kill himself.

¶ 53 Further, at the aggravation/mitigation hearing, Durand speculated that defendant suffered from mental difficulties, based on interviews with defendant's family and probation department reports. Durand conjectured that defendant's bed-wetting as a child and the existence of several dysfunctional relationships were factors indicating potential mental problems.

¶ 54 But the record shows that the existence of impairment, from any source, is at best speculative. Further, in addition to offering equivocal evidence of mental impairment, defendant offered no evidence to show the requisite causal nexus that mental impairment affected his judgment or his actions at the time of the murder. *See Jones*, 185 Ariz. at 492, 917 P.2d at 221; *Apelt*, 176 Ariz. at 377, 861 P.2d at 662. Thus, we conclude that the trial court ruled correctly that impairment was not established as a nonstatutory mitigating factor by a preponderance of the evidence.

### 4. Military Record

¶ 55 We have on rare occasions found that a defendant's military record war-

ranted consideration as a mitigating circumstance. *See Spears,* 184 Ariz. at 293–94, 908 P.2d at 1078–79 (giving "some weight" to this factor in combination with defendant's background, love of family, employment history, and good conduct during incarceration); *State v. Lavers,* 168 Ariz. 376, 396, 814 P.2d 333, 353 (1991) (considering military service and employment history together as a mitigating circumstance); *State v. Johnson,* 131 Ariz. 299, 305, 640 P.2d 861, 867 (1982) (considering defendant's military history, family ties, and good reputation as mitigation, but not enough to warrant leniency).

¶ 56   In *Spears,* the defendant served two full terms in the military (each lasting four years) and had compiled an unblemished record.  184 Ariz. at 294, 908 P.2d at 1079.  In contrast, defendant herein served one year in the military before requesting release.  Given the record before us in relation to defendant's military service, we find no error in the trial judge's conclusion that defendant's service was not a mitigating circumstance worthy of consideration in this case.

### 5.  Sentencing Disparity

¶ 57   A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity.  *See Henry,* 189 Ariz. at 551, 944 P.2d at 66; *State v. Mann,* 188 Ariz. 220, 230, 934 P.2d 784, 794 (1997); *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993).  Here, the trial court stated that "[i]n this case, there is a clear explanation that is essentially the same as noted by the Supreme Court in the *Mann* case."  In *Mann,* we did not find sentencing disparity to be a mitigating factor when an accomplice who aided in stealing drugs and in committing the murder was not charged with any crime and the defendant received a death sentence.  We determined the disparity was explained because defendant was the instigator of the crime and the actual killer; further, the accomplice was given sentencing immunity by the State in exchange for testimony against the actual killer.  *See State v. White,* 1999 WL 374369 (Ariz.) (1999).

¶ 58   The trial judge correctly observed that the same explanation for sentencing disparity exists in this case.  The State entered a plea agreement with Kester and presented substantial evidence that showed defendant was the instigator of Haas' murder and the actual killer.  *See also State v. Dickens,* 187 Ariz. 1, 26, 926 P.2d 468, 493 (1996) (age differences and existence of plea agreement justified sentencing disparity); *Stokley,* 182 Ariz. at 523–24, 898 P.2d at 472–73 (existence of valid plea agreement explained sentencing disparity); *State v. Detrich,* 188 Ariz. 57, 68–69, 932 P.2d 1328, 1339–40 (1997) (appropriate plea agreement and less culpability explained sentencing disparity).  The trial court did not err when it concluded that sentencing disparity was not established as a mitigating factor by a preponderance of the evidence.

### 6.  Intelligence

¶ 59   Intelligence is most often considered in our case law on mitigation as part of our assessment whether the age factor should apply.  *See* A.R.S. § 13–703(G)(5); *Djerf,* 191 Ariz. at 598, 959 P.2d at 1289; *Soto–Fong,* 187 Ariz. at 210, 928 P.2d at 634; *State v. Gallegos,* 185 Ariz. 340, 346, 916 P.2d 1056, 1062 (1996).  Intelligence also has been considered as part of determining whether a head injury caused damage sufficient to warrant consideration as a mitigating factor.  *See Stokley,* 182 Ariz. at 521, 898 P.2d at 470.  The cases that have evaluated intelligence as an independent mitigating factor have concluded that evidence of intelligence, as in defendant's case, is not a mitigating factor.  *See Henry,* 189 Ariz. at 552, 944 P.2d at 67 (finding intelligence was used to deceive investigating authorities and was therefore entitled to no mitigating consideration); *Atwood,* 171 Ariz. at 653–54, 832 P.2d at 670–71 (high IQ was not a mitigating factor because defendant's record showed that he would not use his intelligence to seek reform, as argued).

¶ 60   In contrast, some cases have found low intelligence a mitigating factor.  *See State v. Lee,* 185 Ariz. 549, 553, 917 P.2d 692, 696 (1996); *State v. Amaya–Ruiz,* 166 Ariz. 152, 178, 800 P.2d 1260, 1286 (1990); *State v. Bishop,* 127 Ariz. 531, 535, 622 P.2d 478, 482 (1980).  Considering these cases, the trial

judge committed no error by finding defendant's relatively high intelligence was not a mitigating factor.

### 7. Post–Murder Physical Health

¶ 61 Defendant asks us to consider his poor post-murder physical health as a mitigating circumstance. We have addressed defendant's mental health; however, he now argues that poor post-murder physical health, as well, can constitute a mitigating circumstance. The trial court did not address this factor because it is offered for the first time on appeal. Section 13–703(G) requires us to consider factors that are "relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." We find no case in which poor post-murder physical health was found as a mitigating factor, and defendant has directed us to none. This absence of authority is expected because defendant's post-murder physical health does not address his pre-murder character, nor does it address his propensities, his record, or the circumstances of the offense, as mandated by A.R.S. § 13–703(G). On the present record, no weight can be accorded this factor in our assessment of defendant's sentence.

### 8. Ability to Contribute to Society

¶ 62 This factor, too, strays from the section 13–703(G) mandate that mitigating factors must relate to the "defendant's character, propensities or record and any of the circumstances of the offense." The trial judge did not err when he failed to find defendant's alleged ability to contribute to society as a mitigating factor.

### 9. High Cost of Execution

¶ 63 Defendant argues the trial judge should have considered *sua sponte* the high cost of execution as mitigation, when compared to life imprisonment. Some commentators have asserted that executing a convicted murderer costs a state more money and resources than the imposition of a life sentence. *See, e.g.,* Justin Brooks & Jeanne Huey Erickson, *The Dire Wolf Collects His Due While the Boys Sit by the Fire: Why Michigan Cannot Afford to Buy into the Death Penalty,* 13 T.M. Cooley L.Rev. 877 (1996); Joseph W. Bellacosa, *Ethical Impulses from the Death Penalty: "Old Sparky's" Jolt to the Legal Profession,* 14 Pace L.Rev. 1 (1994); Steven G. Gey, *Justice Scalia's Death Penalty,* 20 Fla. St. U.L.Rev. 67 (1992). Even assuming the expense factor is accurate, the cost of execution cannot be considered a mitigating factor. The death penalty represents a legislative policy choice by the people's representatives regarding the level of punishment for Arizona's most serious criminal offenders, and it transcends a financial cost/benefit analysis. The United States Supreme Court has determined that nothing in the U.S. Constitution forbids state legislatures from making this choice so long as constitutional boundaries are satisfied. *See Gregg v. Georgia,* 428 U.S. 153, 179–80, 96 S.Ct. 2909 (1976); *Proffitt v. Florida,* 428 U.S. 242, 260, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 277, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

¶ 64 We therefore do not consider as mitigation the high cost of execution. To do so would contradict Arizona's public policy decision and would violate the court's mandate to consider mitigating factors that relate not to cost, but to a "defendant's character, propensities or record and any circumstances of the offense" under section 13–703(G). Defendant's argument that the death penalty be cast aside because of the alleged financial drain should be addressed to the legislature. The trial court did not err when it failed *sua sponte* to consider cost a mitigating factor.

### C. Summary of Aggravating and Mitigating Evidence

¶ 65 We conclude that the State proved beyond a reasonable doubt the existence of two statutory aggravating factors—previous conviction of a serious offense pursuant to A.R.S. § 13–703(F)(2) and pecuniary gain pursuant to A.R.S. § 13–703(F)(5). Defendant proved only one mitigating circumstance by a preponderance of the evidence—defendant's importance in the life of his youngest child. On this record, we approve the trial court's decision that aggravating factors substantially outweigh mitigating factors.

## IV. Constitutionality of Lethal Injection

¶ 66　Appellant contends that death by lethal injection is cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. This court has concluded previously that lethal injection is a constitutional form of execution. *See State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

## DISPOSITION

¶ 67　Upon full review, we affirm defendant's convictions and sentences.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, STANLEY G. FELDMAN, Justice, FREDERICK J. MARTONE, Justice, RUTH V. MCGREGOR, Justice.