65 P.3d 61

**STATE of Arizona, Appellee,**

v.

**Danny N. MONTAÑO, Appellant.**

**No. CR–99–0439–AP.**

Supreme Court of Arizona,
En Banc.

March 17, 2003.

Janet A. Napolitano, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section, Jack Roberts, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Law Office of Carla G. Ryan by Carla G. Ryan, Tucson, Attorney for Appellant.

## OPINION

ZLAKET, Justice (Retired).

¶ 1 Appellant Danny Montaño appeals from his convictions and sentences on one count of first degree murder and one count of conspiracy to commit first degree murder. We have jurisdiction pursuant to Arizona Constitution, Article VI, Section 5(3), Arizona Revised Statutes (A.R.S.) sections 13–4031 and –4033 (2001), and Arizona Rule of Criminal Procedure 31.2(b).

## FACTS AND PROCEDURAL HISTORY

¶ 2 Appellant and David "Spanky" Jimenez shared a cell at the Cimmaron Unit of the Department of Corrections in Tucson. They entered Raymond Jackson's cell on August 7, 1995. Appellant asked, "What's happening?" and closed the door. Loud noises and screaming were then heard. When the appellant and Jimenez exited, a concentrated clean-up effort ensued involving those two men and at least one other inmate. Shortly thereafter, a guard making rounds found Raymond Jackson face down on his bunk, covered with a sheet. He had been stabbed 179 times.

¶ 3 The prison was immediately locked down. A search of the cell shared by the appellant and Jimenez revealed bloodstains on the floor and a bag of bloodstained clothing. Appellant had a fresh, bleeding cut on the back of his right hand. While four "shank"-type weapons were found in the cellblock, including two in a porter's closet drain, none was ever linked to the appellant.

¶ 4 Almost two years later, on June 24, 1997, a complaint was sworn out against the appellant and Jimenez. On August 12, a preliminary hearing was held at which three inmates testified: David Gallardo Soto, Jose Alcarez–Lopez, and George Bidwell. The state requested this hearing, in part, to preserve the testimony of these men, whom it feared might be killed before trial. The defense offered to stipulate the existence of probable cause, but the prosecution declined to do so.

¶ 5 Soto shared a cell with Mario Arvisu. He testified that on the day before the killing, Arvisu and inmate "Boo–Boo" Jerez told him to leave the cell because they had business to discuss. Soto lingered next to the closed door and eavesdropped. He heard Jerez say, "We have to kill him," to which Arvisu responded: "No, we don't have to do it. I spoke with Danny and Spanky, and they're going to do it."

¶ 6 On the day of the murder, Soto was in his cell. When he began making noise, he saw Arvisu gesture to keep quiet. Arvisu pointed toward Jackson's cell and then spoke to another inmate who came up to Soto's door to tell him to be quiet. Soto saw the appellant and Jimenez leave their cell and walk to Jackson's. He later saw them exit Jackson's cell. Appellant was carrying a red towel, and his clothes had blood on them. Shortly thereafter, Soto walked to their cell and asked Jimenez for tobacco. Appellant was standing at the sink, washing himself. A few moments later, Soto passed their cell door again, and the appellant was flushing the towel down the toilet.

¶ 7 Inmate Jose Alcarez–Lopez testified that at the time of the murder he lived in the cell next to Jackson's. He was cleaning his sink when he saw the appellant and Jimenez enter Jackson's cell. He heard the appellant say, "What's happening?" and saw him close the door behind them. Alcarez–Lopez then heard "screaming, like of pain." He quickly went to the showers because he thought that the fight would lead to a lock-down and loss of showering privileges for a few days. As he passed Jackson's cell, he looked in and saw the appellant hitting Jackson and Jimenez trying to pry something out of Jackson's hand. After he returned from the shower, he saw Jimenez and the appellant pass his door and go to their cell. Appellant was concealing something as he walked.

¶8 Inmate George Bidwell testified both at the preliminary hearing and at trial. He said that on the day in question he heard "a lot of noise . . . a lot of dings and bangs and thumps going on upstairs." He also heard "a real deadly kind of screaming . . . as if someone were hurt real bad." He, like Alcarez–Lopez, headed for the showers, and while en route saw the appellant going back and forth between his cell and Jackson's cell. He was later approached by Jimenez and another inmate, who asked if he had any cleaning supplies.

¶9 By the time of the trial, both Soto and Alcarez–Lopez had been released from custody and were living in Mexico. Upon the state's motion and following a hearing on the matter, they were deemed "unavailable" for trial. The videotape of their preliminary hearing testimony was played for the jury. Bidwell testified at trial in person, and did so consistently with his preliminary hearing testimony.

¶10 Also at the trial, Officer Jimmie Byrd testified that when he was making rounds that day, an inmate named Torres stopped him. Torres engaged him in conversation about a recent boxing match. Byrd testified that this was unusual because inmates do not often engage in friendly banter with guards. He also said that he saw no one enter or leave Jackson's cell, nor did he see anything unusual regarding that cell all day. He did, however, hear lots of flushing coming from the appellant's cell and saw the appellant carrying a mop. He saw that the floor of the cell was damp, and the garbage can was full of water.

¶11 The state introduced photographs of a fresh, bleeding cut on the back of the appellant's right hand, purportedly taken immediately after the attack. The state also introduced testimony regarding boot prints found in blood on the floor of the victim's cell. A pair of dark brown boots was taken directly from Jimenez's feet after the murder. DPS Lab Director Ron Bridgemon testified that these boots were capable of having produced the prints found on the floor. Admittedly, any shoe of that pattern and size could have made them. DNA analysis, however, showed that the appellant's blood was on the boots.

¶12 The investigators also took a pair of size 8 boots from a shelf in the cell occupied by the appellant and Jimenez. The soles had a distinctive heel notch and random nail holes. Bridgemon found that these marks matched a photo of prints in the blood on the floor of Jackson's cell. Moreover, later testimony established that the boots had bloodstains containing DNA consistent with Jackson's, but not with that of the appellant, Jerez, Jimenez, or inmate Ricardo Rodriguez.

¶13 A brown bag containing two pairs of sweat pants, two sweatshirts, and a pair of white "jockey-type" shorts was found in a trash can in the cell occupied by the appellant and Jimenez. Blood found on the sweatshirt was consistent with Jackson's DNA, but the appellant, Jerez, Jimenez, and Rodriguez were all excluded. The same results were obtained from a bloodstain found on some shorts in the trash can. A pair of sweat pants had a mixture of the appellant's and Jackson's blood on it. DNA in perspiration from the leg of one of the sweat pants had two donors. There was not enough from the primary donor to determine identity, but the appellant and Jimenez were ruled out as secondary donors. DNA in perspiration from the waistband of those same sweat pants also had two donors. It had six markers for Jimenez, a combination that occurs in 1 out of 2500 people. Appellant was the secondary donor.

¶14 Appellant was found wearing white boxer shorts, which had two separate stains on them. One stain consisted of his own blood and the other a mixture of his blood and the victim's.

¶15 When the state rested, the defense presented no evidence of its own at the trial.

## PRETRIAL AND TRIAL ISSUES

### A. Preindictment Delay

¶16 The appellant's major complaint is the two-year delay between the crime and the indictment. He alleges that the state intentionally postponed filing charges to ensure that Soto and Alcarez–Lopez had been released and deported to Mexico. Appellant

claims that this delay prejudiced him by denying his right to rigorous cross-examination. He presents no direct evidence of the state's intent, but asserts that it had collected everything necessary to initiate the case within days of the crime. He also alleges that the state intimidated Soto and Alcarez–Lopez into leaving the country upon their release.[1]

¶ 17 The state contended that because the appellant failed to raise this argument in a pretrial motion, he was barred from doing so by Arizona Rule of Criminal Procedure 16.1(b) and (c). The trial judge agreed. Rule 16.1(b) provides that "[a]ll motions shall be made no later than 20 days prior to trial, or at such other time as the court may direct." Failure to comply means that the motion "shall be precluded, unless the basis therefor was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it." Ariz. R.Crim. P. 16.1(c).

¶ 18 We agree with the trial court.[2] Appellant did not make a motion to dismiss twenty days before trial. This court has barred similar claims when they were not timely raised. *See, e.g., State v. Sustaita,* 119 Ariz. 583, 591, 583 P.2d 239, 247 (1978); *State v. Torres–Mercado,* 191 Ariz. 279, 281, 955 P.2d 35, 37 (App.1997) (stating that motions made "just before trial" challenging constitutionality of statute were untimely under Rule 16.1(b)).

**1.** The state's explanation for the delay was that the DNA lab's priority rules placed this case at the bottom of the pile. Deborah Friedman, a technician in DPS's Southern Regional Crime Laboratory, sent a number of items to Phoenix on April 4, 1996, eight months after the murder. Phoenix DPS criminalist Kathleen Sartor testified that she performed DNA testing on the evidence in this case on December 17, 1996, one year and four months after the murder. Her final report was completed on May 14, 1997. Sartor also said that cases with an immediate court date got priority; that the lab would analyze the most probative items first; and that it would move to the less probative items only if needed. Given those parameters, she agreed that "a case with a whole lot of items that didn't have a trial date" would have very low priority.

**2.** Even without a waiver, the appellant's claim under the Sixth Amendment is without merit. In *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971), the Court

### B. Inability to Argue the Delay

¶ 19 The trial judge granted the state's motion to preclude the appellant from arguing to the jury that the delay affected his ability to mount a defense, saying:

> This is an issue most properly brought before the Court in pretrial motions. It is a legal issue where the Court needs to determine whether or not this delay in fact caused any harm to the defense actions to defend in this matter. That was never before the Court in pretrial motions.

Appellant contends he should have been able to tell the jury that his defense was hindered by the delay insofar as it caused the absence of witnesses Soto and Alcarez–Lopez. He also asserts that the state opened the door to this type of argument when it asked DPS lab technician Sartor about the priority rules at the lab.

¶ 20 The trial judge had the authority to preclude such argument pursuant to Rule 16 and in the exercise of her wide discretion to control the trial. *Higgins v. Arizona Sav. & Loan Ass'n,* 90 Ariz. 55, 62, 365 P.2d 476, 481 (1961); *Daru v. Martin,* 89 Ariz. 373, 381, 363 P.2d 61, 66 (1961) (jury argument is subject to reasonable regulation). Even assuming, however, that the appellant should have been permitted this latitude, we cannot say that he suffered prejudice in view of the other substantial

held that absent "either a formal indictment or information or else the actual restraints imposed by arrest and holding," there is no basis for relief. Because the appellant alleges only pre-indictment delay, the Sixth Amendment's speedy trial protections are of no help to him. His Fifth and Fourteenth Amendment claims are also meritless. In *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Court cited *Marion* as authority for the proposition that "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. at 2049. The Court's limited role is "to determine only whether the action complained of here ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.' " *Id.*(citations omitted). Arizona has followed these two cases. *See State v. Torres,* 116 Ariz. 377, 569 P.2d 807 (1977).

evidence of guilt. There was no reversible error here.

## C. The Confrontation Clause

¶ 21 Soto and Alcarez–Lopez testified at the preliminary hearing. Their video-taped testimony was admitted at trial pursuant to Arizona Rule of Criminal Procedure 19.3(c) and Arizona Rule of Evidence 804(a)(5). Appellant claims that his constitutional right to confront witnesses was violated by the admission of this evidence. U.S. Const. amend. VI; Ariz. Const. art. 2, § 24. The Confrontation Clause is applicable to states via the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 401, 85 S.Ct. 1065, 1066, 13 L.Ed.2d 923 (1965).

¶ 22 Alex Saucedo, a criminal investigator, was the liaison between the county attorney and these two witnesses. He began the process of securing their presence for trial prior to their release. In the case of Alcarez–Lopez, he obtained contact information from multiple family members, both in Mexico and in the United States. After release of the witness, Saucedo performed searches of utility records in Mexico and telephoned family members in an unsuccessful effort to locate him. Alcarez–Lopez was never served with a subpoena. On January 21, 1999, the prosecutor advised the court that Saucedo had been informed by a relative of Alcarez–Lopez that he was willing to come back. The state prepaid plane tickets from Ensenada to Tucson and arranged for INS parole, but Alcarez–Lopez never boarded the plane in Ensenada.

¶ 23 As to Soto, Saucedo followed similar tactics, contacting his daughter in Tucson as a lead. Saucedo testified that on or about December 10, 1998, he got a tip that Soto was in Tucson illegally. Saucedo called the county attorney and the INS. The INS told him that Soto could come into the United States legally for the trial if he got a special parole status from that agency, which meant being kept in custody in a hotel setting. The INS also told Saucedo that Soto was subject to two to ten years in a federal penitentiary if he was caught here illegally. Saucedo found Soto and told him about the special parole provision that would allow him to come back to testify. He also told Soto that if he remained in the country illegally and was caught, he could be imprisoned. It was Saucedo's decision to tell Soto this; he was not acting on orders from anyone. Saucedo did not report Soto to the INS. Soto, who *was* subpoenaed, remained in touch with Saucedo and his staff until just two weeks before the trial.

¶ 24 "[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial, and ... 'a primary interest secured by the provision is the right of cross examination.' " *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980) (citation omitted). There are, however, appropriate instances where testimony is admitted despite the absence of a witness. The Supreme Court has outlined a two-step approach in identifying such cases. First, it must be shown that the witness is unavailable. *Id.* at 65, 100 S.Ct. at 2538. Even then, statements are admissible only if they bear an "indicia of reliability." *Id.* at 66, 100 S.Ct. at 2539. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* Arizona follows this approach. *E.g., State v. Edwards,* 136 Ariz. 177, 181, 665 P.2d 59, 63 (1983).

¶ 25 Appellant challenges the unavailability of Soto and Alcarez–Lopez, a finding we review for abuse of discretion. *State v. Sayre,* 108 Ariz. 14, 15, 492 P.2d 393, 394 (1972). "A witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543 (quoting *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968)). Appellant alleges that the state did not put forth such an effort.

¶ 26 The length to which the state must go to produce a witness is a question of reasonableness. *Id.* (quoting *California v. Green,* 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring)). We have framed the inquiry as "whether the leads which were not followed

would have been the subject of investigation if the State had been trying to find an important witness and had no transcript of prior testimony." *Edwards,* 136 Ariz. at 182, 665 P.2d at 64.

¶ 27 Moving from one state to another cannot be the sole basis for unavailability of a witness; good faith efforts to locate him or her are still required. *Barber,* 390 U.S. at 723–24, 88 S.Ct. at 1321; *Edwards,* 136 Ariz. at 182, 665 P.2d at 64. However, the issue is less clear-cut when a witness removes himself to a foreign country. In *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), the witness was a Swedish citizen and had returned there. The Supreme Court held that "the predicate of unavailability was sufficiently stronger here than in *Barber.*" *Id.,* 408 U.S. at 212, 92 S.Ct. at 2313. This is true because courts generally have no jurisdiction to compel someone in a foreign country to return to the United States for trial.

¶ 28 Some have taken *Mancusi* to mean that witnesses in foreign countries are constitutionally unavailable regardless of the state's efforts to locate them. *E.g., State v. Alvarez,* 45 Wash.App. 407, 726 P.2d 43, 47 (1986); *Cordovi v. State,* 63 Md.App. 455, 492 A.2d 1328, 1332 (1985). At least one court has thought otherwise. In *People v. Sandoval,* 87 Cal.App.4th 1425, 105 Cal.Rptr.2d 504 (2001), the California Court of Appeal found that the state was required to make a good faith effort to obtain the presence of a witness from Mexico. The court based much of its analysis on a treaty between nations. *Id.* at 514 (quoting Mutual Legal Assistance Cooperation Treaty, Dec. 9, 1987, U.S.-Mex., 27 I.L.M. 443, 447). It held that the state's efforts were not reasonable, largely because the prosecution had refused to fund the return of the witness, and the defendant's right to confrontation was therefore violated. *Id.* at 517.

¶ 29 The defense here asserts that the state would have done more to locate the witnesses had their former testimony not been recorded. As to Soto, this argument fails. He was actually served with a subpoena. While service may not automatically establish a good faith effort, it does seem to

fulfill what has been identified as the ultimate question in these types of cases: "[T]he true issue is whether the state made a good-faith effort to *locate* the witness so that he or she could be put under subpoena." *State v. Gonzales,* 181 Ariz. 502, 509, 892 P.2d 838, 845 (1995) (quoting *Edwards,* 136 Ariz. at 182, 665 P.2d at 64). Further, although the state did not invoke the treaty providing for cooperation between the United States and Mexico, such action should not be required if it does not appear to be necessary, the witness appears likely to testify, or the state's efforts are otherwise reasonable. *See Sandoval,* 105 Cal.Rptr.2d at 516. Appellant claims that the state had a duty to prevent Soto from "becoming absent," suggesting that the prosecutors should have detained him, or called INS to imprison him, until trial. While the state may, under narrowly defined circumstances, detain a material witness, it can do so only for a limited time. *See* A.R.S. §§ 13–4081 to –4083 (2001) (describing the circumstances and procedures by which an uncharged witness can be held in custody); *see also State v. Reid,* 114 Ariz. 16, 24–25, 559 P.2d 136, 144–45 (1976).

¶ 30 Alcarez–Lopez, on the other hand, was not subpoenaed. The investigator never contacted the Mexican legal authorities to enlist their assistance, even after his unsuccessful search for the witness through family and business leads.

¶ 31 Nevertheless, we cannot say that the trial court abused its discretion in determining that the state acted reasonably and in good faith to procure Alcarez–Lopez's attendance at trial. The appellant has not convincingly pointed out, as *Edwards* requires, what "leads [ ] were not followed." *Edwards,* 136 Ariz. at 182, 665 P.2d at 64. The state attempted to find Alcarez–Lopez. The only thing lacking was a request for the assistance of local authorities, and there is no showing that such action would likely have brought success.

¶ 32 Defense counsel contends that he did not have a "complete and adequate" opportunity to cross-examine Soto and Alcarez–Lopez due to lack of time to prepare for the preliminary hearing. Thus, he argues,

the testimonial exception referred to previously was not satisfied and his client's right to confrontation was violated. We disagree. The state's complaint against the appellant was filed on June 24, 1997, and defense counsel was appointed June 30, 1997. The preliminary hearing was held on August 12, 1997. It was videotaped, and both witnesses were cross-examined under oath. In sum, "[s]ince there was an adequate opportunity to cross-examine the witness, and counsel availed himself of that opportunity, the [preliminary hearing videotape] bore sufficient 'indicia of reliability' and afforded the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *Roberts*, 448 U.S. at 73, 100 S.Ct. at 2542–43 (internal punctuation and citations omitted).

### D. Death Qualification of the Jury

¶ 33 Appellant moved to preclude any voir dire regarding the death penalty, or in the alternative to preclude the court from death qualifying the jury. He also moved to preclude the state from removing for cause any juror who was not "death-qualified." The court denied these motions.

¶ 34 As the nature of the case was being discussed with potential jurors, a woman said that she was not sure she could "sit through the trauma" of a capital trial. The trial judge excused her from duty, and the appellant did not object. The judge then asked the entire panel, "Are any of you so opposed to capital punishment that you could not sit and listen to the evidence, listen to the law, without considering the fact that the death penalty might be imposed?" Nine jurors said yes. The judge spoke individually with each of them and excused all nine. The defense objected to only one excusal—a Ms. Jones. Later, as the trial jury was to be sworn, the appellant's counsel renewed the objection to death qualification.

¶ 35 Appellant now appeals the excusal of the nine prospective jurors. The Supreme Court has held that removing all venire persons who state general objections to the death penalty violates the Sixth Amendment. *See generally Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

¶ 36 Arizona case law has upheld death qualification. *E.g., State v. Hoskins*, 199 Ariz. 127, 141–42, ¶ 50, 14 P.3d 997, 1011–12 (2000). For a jury to be death qualified, the trial judge must at least inquire as to whether a given juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citation omitted). This court gives broad deference to the trial judge's decisions regarding excusal of venire persons and generally reviews only for abuse of discretion. *State v. Jones*, 197 Ariz. 290, 302, ¶ 24, 4 P.3d 345, 357 (2000).

¶ 37 Appellant claims that his objections to death qualification before and after the voir dire have preserved this issue as to all nine venire persons. However, "a general objection to death penalty questioning does not serve as an objection to preserve on direct appeal the issue of whether individual jurors were improperly dismissed for cause because of their death penalty views," and excusals for which there is no specific objection receive only fundamental error review. *State v. Kayer*, 194 Ariz. 423, 432, ¶ 24, 984 P.2d 31, 40 (1999) (citations omitted). Thus, only the excusal of Jones was preserved for appeal. The discharge of the other eight can be reviewed only for fundamental error.

¶ 38 Jones's statements on the issue were as follows:

> I think I could sit fairly and impartially but, given the fact that the death penalty might be imposed, there is a possibility— it's just—I just don't think I could do it. . . . I could still listen to the evidence, I could still make a decision about guilt or innocence; but, knowing that the death penalty may be—it would just—I would— it wouldn't be—I mean, it would—I would have a hard time for—because of religious grounds for me.

The court excused Jones, and the defense objected, stating that "[s]he's indicated that she could listen to the evidence, that she would make a decision. She just indicated that it would be difficult."

¶ 39 First, the objection reflects a selective reading of the woman's statement. Before the part about having a "hard time" with it, she said, "I just don't think I could do it." More importantly, the *Witherspoon/Wainwright* standard encompasses views that prevent or substantially impair a potential juror's performance. Where the juror indicates as much reservation and conflict about the death penalty as Jones did here, a judge could reasonably conclude that her performance would be substantially impaired by her feelings about capital punishment. The trial court did not abuse its discretion.

¶ 40 "Fundamental error is error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). The trial court was required to excuse for cause those venire persons who did not "provide assurance that their death penalty views [would] not affect their ability to decide issues of guilt." *Kayer*, 194 Ariz. at 432, ¶ 27, 984 P.2d at 40. Each of them gave answers from which it could be inferred that their ability to decide guilt was impaired. Thus, their excusal was not error, much less fundamental error.

### E. Prosecutor's Statements During Voir Dire

¶ 41 When the jury panel was being questioned, the prosecutor stated that "shows like '60 Minutes,' 'Nightline,' 'Dateline,' and 'Primetime' and '20/20,' " often discuss "people who are behind bars mistakenly." He then asked, "Is there any of you who feel just bad inside if you, for whatever reason, or moral belief, that feels—really don't want to be placed in a position of sitting in judgment of another person, deciding guilt or innocence." Defense counsel asked the court to dismiss the entire panel because the prosecutor had suggested to the jury "that it doesn't matter if they make a mistake." The court denied this request. On appeal, the appellant claims that this line of questioning violated his Sixth Amendment rights by denying him a jury that "understands their obligations and who are not concerned with

someone looking over their shoulder and second-guessing them."

¶ 42 The jurors took their oaths, and we must presume they carried them out. Absent a showing that they abdicated their proper role or function, this argument fails.

### F. Insufficient Evidence

¶ 43 Appellant challenges the sufficiency of the evidence on both counts. Here, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Tison*, 129 Ariz. 546, 552, 633 P.2d 355, 361 (1981).

¶ 44 At a post-trial hearing, defense counsel stated, "I will concede that if you view the evidence in the light most favorable to the State it is arguable that reasonable people could find sufficient evidence as to Count 1, which is the first degree murder case." The appellant now argues, however, that the state's case was built on the improperly admitted eyewitness testimony of Soto and Alcarez–Lopez, and had that been excluded there would not have been sufficient evidence of first degree murder.

¶ 45 As previously discussed, the testimony in question was properly admitted. Moreover, each element of first degree murder—intent, premeditation, and an act that caused the death of the victim—was proven by strong evidence, as outlined above. *See, e.g., State v. Willoughby*, 181 Ariz. 530, 545, 892 P.2d 1319, 1334 (1995).

¶ 46 "The elements of conspiracy to commit murder are intent to promote the offense of murder and an agreement with another that one will do the actual killing." *Id.; see also* A.R.S. § 13–1003(A) (2001). Again, we believe that the trier of fact could reasonably have reached such a conclusion on the basis of the evidence presented in this case.

### G. The Sealed Documents

¶ 47 Appellant contends that a packet of sealed documents prepared by Jimenez in

connection with his duress defense should have been unsealed and disclosed, and that the state's failure to do so violated the confrontation clause and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

¶ 48 Jimenez moved to sever his trial and filed under seal a "Partial Offer of Proof Re: Duress Defense" and "Exhibits to Defendant's Offer of Proof Re: Duress Defense" on June 25, 1998. On July 20, Judge Raner Collins held a hearing in chambers. Appellant's trial counsel voluntarily left the chambers during these proceedings, for reasons that are unclear. Thereafter, Jimenez filed under seal a "Supplemental Offer of Proof." After the court granted a severance, Jimenez filed under seal something called a "Motion for Disclosure." These four pleadings are the sealed documents at issue.

¶ 49 By the time of trial, Judge Collins had gone to the federal bench, and Judge Deborah J.S. Ward had been assigned to the case. The sealed documents were *not* introduced in evidence at trial. The jury had no idea that they existed. Judge Ward stated that she had never read them. Nonetheless, the appellant asserts that "there were discussions with Judge Ward about it. Therefore, this sealed information was known to the judge to some extent. And its sealed status denied the defense the ability to access this information for possible impeachment purposes or other challenges."

¶ 50 The record reveals that discussions with the court concerned only whether the packet should be unsealed because of the possibility that it contained *Brady* material. At one point, defense counsel stated "there's potential for *Brady* type of material in there." But at a later hearing counsel said, "I don't believe there's any *Brady* material there," to which the court replied, "Good, because I pretty much decided that you're not going to get it." Moreover, the prosecu-

tor avowed that there was no *Brady* material, to the best of his knowledge.

¶ 51 None of the sealed documents were introduced at trial, and Jimenez did not testify. Therefore, appellant's confrontation rights were not violated. *See Ohio v. Roberts*, 448 U.S. at 63, 100 S.Ct. at 2537.

¶ 52 "The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury." *State v. Dumaine*, 162 Ariz. 392, 405, 783 P.2d 1184, 1197 (1989) (citation omitted). However, "*Brady* applies only to items of evidence suppressed by the prosecutor which are favorable to an accused." *State v. Smith*, 122 Ariz. 58, 62–63, 593 P.2d 281, 285–86 (1979).

¶ 53 Appellant's *Brady* claim fails for three reasons. First, it is at least arguable that defense counsel waived his request when he told the judge that he did not believe there was *Brady* material in the sealed documents. Second, although these items were within the prosecutor's possession, it was the superior court that ordered them sealed. Thus, it is not the case that the prosecutor "suppressed" the documents. Finally, the appellant cannot show that the sealed materials were in any way exculpatory. In fact, there is a strong implication that they were not because their purpose was to support the Jimenez duress claim. Therefore, they most probably contained unfavorable information about the appellant.[3]

¶ 54 We have previously denied the appellant's motion to unseal these documents. He again claims that unsealing is necessary, and adds as a reason that they might have influenced the trial judge at sentencing. According to the record, however, the trial judge never looked at them. *See* ¶¶ 49–51, *supra*. We see no error here.

---

**3.** This implication is supported by testimony of Jimenez at a later hearing on a motion to suppress, during which he referred to the appellant as a "captain of the Mexican Mafia." It is also supported by the unsealed reporter's transcript of the July 20, 1998 hearing, in which Jimenez's attorney mentions threats to Jimenez's family and others, the appellant's gang membership, and Jimenez's duress caused by the appellant's potential for violence. It was suggested that Jimenez and other witnesses would be reluctant to testify in any proceeding where the appellant was present. Thus, a severance was being sought.

## H. Photographic Evidence

¶ 55 Appellant claims the judge abused her discretion under Arizona Rule of Evidence 403 in deciding to admit photos of the victim's body. This court reviews a trial judge's decision to admit such evidence using an abuse of discretion standard. *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). The photos in question show the following:

Exhibit 7: Face with cuts on forehead, bruising, and badly split lip.

Exhibit 25: View through cell 7 door, with the victim prone on bunk, facing away. Floor covered in blood.

Exhibit 27: Polaroid of victim on his bed, clothed and bloody; a closer view of 25.

Exhibit 85: Right arm and pectoral, 5–6 punctures.

Exhibit 89: Left side of victim's torso, dozens of punctures.

Exhibit 93: Victim's right hand, with cuts.[4]

¶ 56 Dr. Andrew Sibley, the medical examiner, testified that exhibits 85, 89, and 93 depicted defensive wounds. He said that exhibit 7 showed sharp force wounds to the victim's head and a blunt force injury to the lip. Appellant objected to the relevance of all of these.

¶ 57 Officer Jack Young was the first investigator on the scene. He testified about the state of the cell, the people present, and the actions that the nurse took inside the cell once she arrived. He did not specifically refer to exhibits 25 and 27, but they were published to the jury during his testimony. Defense counsel questioned Officer Young about the time the pictures were taken, and then made general objections to their admission.

¶ 58 The state points out that the appellant objected only generally, and thus has waived any Rule 403 objection. We have stated:

[I]f the admission is over objection [error] can [not] be predicated on grounds other than those urged in the objections. If the

offered evidence was not objectionable upon the grounds urged, its admission, although for other reasons improper, cannot be made the basis of error on appeal.

*Cooper v. Francis*, 36 Ariz. 273, 279, 285 P. 271, 273 (1930) (citation omitted); *see also Skousen v. Nidy*, 90 Ariz. 215, 217, 367 P.2d 248, 249 (1961). Because the appellant's trial counsel did not object on 403 grounds, the argument has been waived. Even in the absence of a waiver, however, we could not say that there was an abuse of discretion in permitting the photographs to be admitted in this case.

## I. Gang Evidence

¶ 59 Appellant claims that the court erred in permitting the state to solicit gang-related testimony from Officer Cruz and inmate Bidwell. He grounds this objection on Rule 403, Arizona Rules of Evidence. Officer Cruz testified that he saw the appellant and Jimenez as "two peas in a pod." The state introduced exhibit 56, a photo of Jimenez which showed an "EME" tattoo on his neck. The prosecutor asked Cruz what EME stood for, and the witness answered "Mexican Mafia." The defense objected to the foundation. The state laid more foundation and repeated the question. The defense then objected on relevance grounds and argued that "[t]his is in 1992," apparently referring to the date of the photograph. The court overruled the objection.

¶ 60 Inmate Bidwell testified that his cellmate was involved in the "whites" gang. The defense did not object. Bidwell also said Jerez was running the EME gang. It is noteworthy that on cross-examination, the *defense* elicited four transcript pages of gang testimony—how they tend to divide along lines of race, nationality, etc.

¶ 61 The threshold issue is whether the appellant has preserved this issue for appeal. When Bidwell testified about his cellmate's gang affiliation and Jerez's status as head of the EME, the appellant failed to object. However, when Officer Cruz testified about

---

4. It should be noted that the appellant does not challenge two of the most repulsive photographs, exhibits 86 and 88. They show each side of the victim's neck with 35 and 34 clustered stab wounds, respectively.

the meaning of Jimenez's EME tattoo, the defense objected to relevance and foundation.

¶ 62 As to the failure to object, the law is well settled: objections which are not raised are waived, except where fundamental error may be involved. *E.g., State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). Officer Cruz's testimony at worst told the jury that the co-defendant Jimenez was a gang member. They may have deduced from this that the appellant was also a gang member. But the state's case here hinged on the eyewitness testimony placing the appellant in the dead man's cell, the sounds of screaming while he was there, and the DNA evidence. Bidwell's testimony regarding his cellmate's gang activities does not rise to the level of fundamental error.

¶ 63 Appellant's objections at trial went to foundation and relevance.[5] On appeal, he argues more specifically that the admission of this testimony violated Rule 403, which weighs the probative value against the prejudicial effect. We hold, however, that he has waived any Rule 403 objection to this testimony.

## J. Sanitizing the Prior Convictions of Witness Bidwell

¶ 64 Bidwell was convicted of possession of child pornography and attempted child molestation in 1995 and 1996. The state did not argue that the priors should be excluded but did ask that they be sanitized to lessen their prejudicial effect.

¶ 65 Appellant argues that the nature of the convictions went to Bidwell's motive to testify, namely, that if other inmates had found out that he was a child molester they would have killed him. Thus, asserts the appellant, the witness made up testimony to get out of the general population. The state claims that Bidwell got protective custody only because he was testifying against a gang member. The judge precluded details of the convictions. Thus, when the witness testified, both sides questioned him about his

prior convictions but neither delved into their nature.

¶ 66 Rule 609(a) states that a prior conviction of a felony can be admitted to impeach a witness if its probative value outweighs its prejudicial effect. Ariz. R. Evid. 609(a). Our case law has consistently approved of sanitization as a means of limiting prejudicial effect. *E.g., State v. Williams,* 144 Ariz. 479, 482, 698 P.2d 724, 727 (1985). It is a matter within the trial judge's sound discretion. We cannot say that sanitization was improper here. Appellant was still able to bring out the fact of Bidwell's prior felony convictions on cross-examination.

## K. Soto's Alleged Hearsay Testimony

¶ 67 Appellant contends that Soto's statements regarding the conversation he overheard between Arvisu and Jerez, recounted above, constituted hearsay that was improperly admitted at trial. Once more, the trial court's ruling is reviewed for abuse of discretion. *State v. Stanley,* 156 Ariz. 492, 495, 753 P.2d 182, 185 (App.1988).

¶ 68 Pursuant to Arizona Rule of Evidence 801(d)(2)(E), "[s]tatements of a co-conspirator will be admitted when it has been shown that a conspiracy exists and the defendant and the declarant are parties to the conspiracy." *State v. Baumann,* 125 Ariz. 404, 411, 610 P.2d 38, 45 (1980). Appellant seems to cede the existence of a conspiracy. He unconvincingly argues that there is no evidence linking him to it.

## L. The DNA Evidence

¶ 69 Appellant contends on a number of disparate theories that the DNA evidence used in this case was unreliable: DNA is "magic" and "bogus"; one of the witnesses had a judgment against him; USA Today ran an article calling the British DNA database "flawed"; and the DNA was not overwhelming in this case. These attacks are meritless. They merely reargue the weight of the evidence, which was within the province of the jury. *State v. Neal,* 143 Ariz. 93, 97, 692

---

**5.** Appellant asserts in his opening brief that he objected to gang testimony. The citation he gives as support for this proposition is a discussion between the attorneys and the court about the scope of the testimony of Officer Trevino and Sergeant Wise.

P.2d 272, 276 (1984) ("[T]he credibility of the experts and the weight to be given their testimony [is] also a jury question.").

## M. The State's Alleged Misconduct

¶ 70 Appellant levies a handful of charges against the state and contends that they demonstrate "the prosecution failed to act in good faith in this case." To prove prosecutorial misconduct, the appellant must show: (1) the state's actions were improper; and (2) "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Atwood,* 171 Ariz. 576, 606, 832 P.2d 593, 623 (1992).[6]

¶ 71 First, as previously noted, it is alleged that the state intentionally delayed bringing this case to ensure the unavailability of Soto and Alcarez–Lopez. Appellant is certain that DNA was not responsible for the delay because "the state did not even send it out until after the complaint was filed." The state responds that there is no evidence in the record to support such a claim.

¶ 72 The state's position is that a delay at the DNA lab caused the late filing. *See* ¶ 16, footnote 1, *supra.* Neither the appellant nor his counsel has successfully challenged this explanation. In fact, while arguing a slightly different issue before the trial court, the appellant's counsel ceded the point by saying, "Now, I wasn't able to find any evidence that I could prove in good faith that the State deliberately delayed this case so as to gain strategically."

¶ 73 Appellant further contends that "the State improperly 'educated' the witnesses, Soto and Alcarez–Lopez, and frightened them from being able to testify at trial." Both men were foreign nationals with felony convictions, so their presence in the U.S. would have been illegal without the INS parole discussed above. *See* 8 U.S.C.A. § 1326(b) (West 2001). Nevertheless, there is no evidence that Alcarez–Lopez was ever told he would be imprisoned if caught in the

United States illegally. As for Soto, while it is clear that Saucedo advised him of the penalty for being here without INS approval, nothing in the record suggests that this information was conveyed to intimidate the witness. If such advice had been given in a threatening manner, it is highly doubtful that Soto would have remained in contact with Saucedo and his staff until just before the trial.

¶ 74 Appellant asserts that exhibit 41, a videotape of the crime scene, proves that the investigation by the Department of Corrections was a travesty. The video shows officers carefully avoiding cell 7, searching cell 4, "shaking down" other cells, and cataloging evidence. We see nothing in the videotape that suggests any improper processing of the crime scene by the DOC.

¶ 75 Appellant focuses his criticism on two aspects of the investigation: the dumping of cell 4's trash can and the failure to lift a set of bloody fingerprints seen in Jackson's cell. He alleges that DOC broke the chain of custody by pulling items out of the trash can. The assertion has no merit on its face.

¶ 76 The state admits that the bloody prints were not lifted. However, I.D. Technician Arnaud testified that fingerprints made in blood are not customarily "lifted"; instead, they are photographed in a way that makes comparison possible. He took such photographs in this case. Investigator Grider testified that the lab was unable to make a match using those photos. Appellant did not rebut any of this testimony or present evidence that the procedure followed by the investigators was improper.

¶ 77 During a discussion of how the DNA is obtained from the substrate material, the prosecutor asked one of his witnesses:

Q You are testifying this afternoon in a case involving duct tape?

A Yes, I am.

Q How do you get DNA off of duct tape?

---

6. The state has not raised waiver as a method of disposing of this issue, although it clearly applies here. *See State v. Kemp,* 185 Ariz. 52, 62, 912 P.2d 1281, 1291 (1996) (stating that failure to object waives a claim of prosecutorial misconduct absent fundamental error). The appellant did not clearly object on grounds of prosecutorial misconduct to any of the matters he now raises (although he arguably made an objection regarding pretrial delay at the preliminary hearing).

MR. NESBITT: Objection, Your Honor, improper redirect.

THE COURT: Sustained.

Appellant argues that this constituted improper vouching for the state's experts. We do not agree. Moreover, the objection was not made on vouching grounds and was sustained.

▪ ¶ 78 Finally, in closing argument the prosecutor stated that "Conspiracy existed— all of the evidence points to it, that [appellant] was one of the members. It is clear that he is—along with David Jimenez, who actually did the killing." [7] Appellant argues that this is somehow evidence of a selective prosecution in violation of his rights under the Equal Protection Clause of the Constitution. To prevail on a claim of selective prosecution, however, the accused must show: (1) other similarly situated people were not charged with the crime he is accused of; and (2) the decision to charge him with that crime was made based on an impermissible ground, like race or religion. *United States v. Arias,* 575 F.2d 253, 255 (9th Cir.1978).

▪ ¶ 79 Regarding the murder count, the appellant has not alleged that there is anyone similarly situated other than Jimenez, and both of them were charged. On the conspiracy count, even assuming *arguendo* that the appellant could identify similarly situated uncharged persons, he has made no showing that the decision to charge him was based on an impermissible factor.

## APPEAL ISSUES

### A. Failure to Appoint Second Counsel on Appeal

▪ ¶ 80 Appellant claims that it was a violation of the Equal Protection Clause of the Constitution for the court not to appoint a second counsel on appeal. He has not alleged that his defense counsel was unable to do anything in particular due to the absence of another lawyer. He simply states that capital advocacy requires long, intense hours. We rejected a similar argument in *State v. Nordstrom,* 200 Ariz. 229, 256, ¶ 92,

25 P.3d 717, 744 (2001), stating that "[t]he defendant alleges no prejudice as a result of this denial. . . . Where neither prejudice nor a violation of the rules has taken place, we find no reversible error."

### B. Unsealing of Documents on Appeal

¶ 81 On June 13, 2000, this court's duty justice denied the appellant's request that the sealed documents from the Jimenez hearing be unsealed. Appellant claims that this decision was erroneous. He argues that *Gardner v. Florida* requires appellate courts to unseal documents for counsel to review. 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). But that is not exactly what the case holds.

¶ 82 In *Gardner,* the sentencing judge read an unredacted copy of a sentencing report. Trial counsel saw only a redacted copy despite the fact that the judge based his sentencing decision partly on the report. This, the Supreme Court held, was unconstitutional. Moreover, because the report had been used in sentencing, the entire unredacted report had to be made part of the record on appeal. *Id.* at 360–61, 97 S.Ct. at 1206.

▪ ¶ 83 The trial judge here did not review the sealed items. Appellant argues that bench discussions of these materials are the equivalent of having read them. We have previously rejected that argument. *See* ¶¶ 47–54, *supra.*

## CAPITAL SENTENCING ISSUES

¶ 84 For the reasons set forth in *State v. Jones,* 203 Ariz. 1, 11–12, ¶¶ 39–45, 49 P.3d 273, 283–284 (2002), this opinion is not a final disposition of the case. Any motion for reconsideration appropriately directed to the issues decided herein, however, should be filed as provided by the existing rules. *See* Ariz. R.Crim. P. 31.18. A supplemental opinion regarding capital sentencing issues will be forthcoming.

---

**7.** Appellant claims that the state "admitted" Jimenez was the real killer in this statement. The state responds that the prosecutor said at numerous other points that they both did it.

**DISPOSITION**

¶ 85 Appellant's convictions and his sentence on the conspiracy charge are affirmed. His sentence on the murder conviction is to be addressed in a supplemental opinion.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. MCGREGOR, Vice Chief Justice and STANLEY G. FELDMAN, Justice (Retired).

Pursuant to Arizona Constitution Article VI, Section 3, the Honorable ROBERT D. MYERS, Judge of the Superior Court, Maricopa County, was designated to sit in this case. He has since recused himself because of his retirement from the bench and subsequent position with the office of the Arizona Attorney General.